SIMPSON v. THE STATE.

No. 6750. APRIL 3, 1929. REHEARING DENIED JUNE 13, 1915.

*Wilson, Bennett & Pedrick,* for plaintiff in error. ·

*George M. Napier,* attorney-general, *W. B. Gibbs,* solicitor-general, *T. R. Gress,* assistant attorney-general, and *S. C. Townsend,* contra.

RUSSELL, C. J. Malcolm Morrow, Homer Simpson, E. G. Waller, and Mamie Lee Todd were jointly indicted by the grand jury of Camden County for the murder of C. A. Perry, alleged to have been committed on February 23, 1928. It appears from the record that Malcolm Morrow, E. G. Waller, and Mamie Lee Todd had frequently discussed the ease with which the robbery of the bank in the little town of Kingsland, in Camden County, could be

effected. They had several times commented on the immunity from detection and interference in holding up Perry, the cashier, and the great probability of making their safe escape with all of the bank's available cash. Subsequently to these conversations Simpson, who lived in Cleveland, Tennessee, and had been associated with Morrow in the World War, visited Morrow, and the subject was broached to him. He looked with favor on the project of holding up the cashier; but as he was not acquainted with Waller or Mrs. Todd, nothing was done, and he returned to his home in Tennessee. As Waller had first suggested to Morrow the scheme as it had previously been outlined to him by Mrs. Todd, Morrow mentioned to Waller his conversation with his war comrade, Simpson, who was a very large and muscular man. It was finally agreed between all of the parties, who lived in Jacksonville, Florida, that Simpson be asked to return for the purpose of joining in the robbery of the bank. Simpson was without funds, and informed Morrow that he could not come back unless his expenses were paid; and Waller furnished the money for Simpson's return to Jacksonville. In the meantime Morrow and Waller visited Perry, the cashier of the Kingsland bank, ostensibly with a view to purchasing a plantation five or six miles from Kingsland, belonging to Perry. They finally told Perry they had a purchaser who would come up with them from Jacksonville and examine the property. On the day fixed for the robbery Morrow, Simpson, and Waller went to Kingsland, Waller riding in a Chrysler roadster, and Simpson and Morrow driving a Dodge coupé. Simpson was introduced to Perry, and in the afternoon at the close of the bank's business for the day Perry went with the three to the farm.

Considerable time was spent in examining the property until it was about dusk. It was so late that all parties agreed that they would return to Kingsland. .Perry was sitting in the Dodge car when Morrow, drawing and aiming his pistol, advanced upon Perry and told him to get out of the car, that he wanted to talk to him. Perry had once been taken out by Ku Klux, supposedly, and, drawing his knife, he jumped from the car and advanced upon Morrow despite the pistol pointed in his face. Morrow fired, the first bullet striking Perry in the leg. Perry had remarked as he leaped from the car that he understood they were going to kill him. He continued to advance and the next discharge of Morrow's

pistol shot his knife out of his hand. He instantly stooped and picked up his knife, and as he did so Morrow shot him in the back and he fell to the ground. The physician who examined Perry testified "the cause of his death was multiple perforations of the intestines, due to gun-shot wounds of the abdomen." It was then explained to Perry that they were not Ku Klux, but that they had intended and still demanded that he go with them back to Kingsland and open the safe so that they could carry out their original project. Perry was placed back in the car and compelled to go with the trio back in the night to the bank at Kingsland. On the way back Perry, being critically wounded, surrendered the key to the bank door and gave them the combination to open the money vault. The trio were unable to work the combination. They carried Perry into the bank, and he opened the safe; and thereupon they put all the bank's money into satchels. Waller suggested that they leave Perry in the bank, but Simpson insisted that he should be taken to the hospital at Jacksonville; so it was agreed that Perry should be carried in the Dodge car with Morrow and Simpson. Waller was forced to keep his car behind the Dodge car, and all parties started to Jacksonville. After having gone about 15 miles the Dodge car turned over, flinging Simpson to the earth under the car. Waller tried to pass by, but was again forced to get out of his car and help raise the Dodge Car so as to release Simpson and Perry.

Perry was carried about forty feet from the roadway and thrown face downward in the blinding rain; and the Dodge car being out of commission, Morrow and Simpson got in the Chrysler roadster, and they again started to Jacksonville. When within a few miles of Jacksonville the Chrysler car ran into a telephone pole, and Morrow received serious injuries. The trio proceeded to Mrs. Todd's house in Jacksonville in the car of a passer-by, where a physician was summoned for Morrow, and he was taken at once to the hospital at Lakeland, Florida, where he was subsequently arrested. As Waller, Morrow, and Simpson were driving away, leaving Perry on the side of the road in the rain, W. S. Van Daly, who was on his way from Fernandina to Jacksonville, came up, stopped near the disabled Dodge car, and inquired if anybody was under the car or hurt. He was informed that no one was hurt, and the Chrysler car containing Waller, Simpson, and Morrow rapidly drove away. After their departure Van Daly again in-

quired if any one was hurt, and Perry cried out "Yes," from the side of the road. Van Daly turned his car around so as to throw his lights in the direction of the sound, and discovered Perry with his face to the wet grounds where he had been thrown. Van Daly turned him over and offered to take him in his car to the hospital in Jacksonville, but Perry said he would not go until he could tell Van Daly all about what had occurred, for fear he would not live until they reached Jacksonville. Perry then stated to Van Daly substantially the occurrences hereinbefore set forth, and these details were also testified to by other witnesses in the case. After Perry's statement Van Daly lifted him into the car and carried him to the hospital in Jacksonville, where he died about 46 hours later. Van Daly, Acosta, and other witnesses were permitted to testify to statements alleged to have been made by Perry before his death. In the motion for new trial exception is taken to the admission of this testimony, on the ground that the statements were not in a legal sense dying declarations; also to certain portions of the charge of the court. The motion was based upon the general grounds. It was overruled, and the defendant excepted.

■■ Rarely, if ever, has a case of conspiracy been more clearly proved by direct and circumstantial evidence, and supported by the statement of the defendant, than in this case. The defense to the crime of murder rests upon the proposition that the confessed conspiracy to rob the bank of Kingsland did not include any agreement to kill the cashier. The court is considering together and reviewing the trial of both Simpson and Morrow. Though these defendants were separately tried and the verdicts were returned by separate juries, the defense in both cases is the same. In Morrow's case the point as to whether the court should have allowed other questions to be propounded to the jurors than those propounded upon the voir dire is raised, and no such request appears to have been made in Simpson's case. The admissibility of the testimony of Acosta was not challenged in Morrow's case, while in the case now before us exception is taken to the fact that the court permitted Acosta to testify to the statement set forth in the fourth ground of the motion for a new trial. The defendant objected to Acosta's testimony for the following reasons: "(a) No proper foundation had been laid by the State for the introduction of a dying declaration. (b) In order for a dying declaration to be admissible,

the person must be in the article of death and conscious of his condition. The preliminary investigation of the witness failed to show that the deceased was in the article of death or that he was conscious of his condition. (c) Said witness nowhere in his testimony ever testified as to the condition of the deceased at the time of said alleged statement, or that the deceased had said anything to indicate that he was in a dying condition and conscious thereof, but on the contrary did testify that the deceased made the statement that while he was very sick or weak and badly shot yet he had a strong constitution, which clearly indicated that there was still hope existing in his mind, and he did not realize that he was in the article of death. (d) Movant contends that the admission of said testimony as a dying declaration, over the objection of movant, was error for the reason that it was hearsay, and for the further reason that there was no evidence to show that the deceased was in the article of death and conscious of his condition, but that the evidence clearly showed the contrary to exist—that the deceased at that time had a hope of life."

Regardless of the preliminary examination of the witness, and of the fact that his testimony did not disclose that the declarant himself said that he was in a dying condition and that his statement was made in the consciousness that he was in extremis, we do not think that the court erred in admitting the testimony to which objection is taken. The court had already heard the testimony of the physician as to the nature of the wound. It had also heard the testimony of Van Daly, to the effect that the deceased was so thoroughly conscious of his condition, not only that he must die because his entrails were shot to pieces, but that death might be extremely imminent for the reason that he told Van Daly, lying there in the cold February rain, in what one witness described as an awfully stormy night, that he would not risk even being lifted into the shelter of an automobile, for fear that he would "pass out" before he could give Van Daly the information which he wanted communicated to the authorities. The purpose of a preliminary examination by the court into the admissibility of alleged dying declarations is solely to enable the court to determine whether or not such alleged declarations are prima facie admissible. Where it plainly appears, as in the present instance, that statements have been made which tend to prove that the declarant is in fact dying

or necessarily must die within a brief period of time, and that he himself is conscious of that fact, it is not essential thereafter to prove, by each witness to whom statements with regard to the cause of the declarant's death were subsequently made, the same particulars with regard to the dying condition of the declarant. And so in this case, the State having established by other witnesses the clear fact that the declarant was in a dying condition and was conscious of that fact, and the declarant, according to the testimony, being still in the same condition and his apprehension having culminated in death itself, the substance of statements subsequently made as to the details of the cause of his death are not inadmissible. If the testimony of one witness (and not several, as in this case) is credible to the jury and establishes the fact that the wounds received by the declarant are such as to impress him with the certainty of death, and there is no evidence to the contrary, the testimony of other witnesses who talked with the declarant after his statement, to the effect that he was conscious that he would never recover, would be admissible to prove any fact indicating the identity of his assailants or the manner in which his death was accomplished. And this should be so although these latter witnesses, knowing perhaps that his wounds were fatal, might not have adverted to that particular feature of the case. Any other rule would exclude at times evidence highly important to the administration of justice and the welfare of society.

The fifth ground complains of the admission of the testimony of W. S. Van Daly. The objection was in these words: "May it please your honor, before proceeding to cross-examine this witness further, we desire to move the court to rule out all of the testimony of Mr. Van Daly with reference to statements made to him by the deceased which are introduced by the State as dying declarations, for the reason that in order for a dying declaration to be admissible the person must be in the article of death and conscious of his condition, and the State has failed to prove that he was in the article of death and conscious of his condition." The court did not err in admitting the testimony of this witness. The dying man could not have conveyed to a listener a more vivid portrayal of his consciousness of his impending death than the expression of his fear that he would die even if he allowed himself to be lifted from the beating of the pitiless rain and placed under the

protecting cover of an automobile. This consciousness was so supreme that he seemed to sense that all the chances were against the authorities getting the information, if the effort to remove him was made. It is true that several hours elapsed before death actually supervened, but events justified and sustained his consciousness of his dying condition and there is nothing in the record in this case to show that the declarant's fixed conviction that he was in extremis was ever changed.

■ The charge to which exception is taken in the sixth ground of the motion for a new trial is controlled by the ruling of the court this day in *Morrow* v. *State,* ante.

■ In the seventh ground of the motion error is assigned upon a charge of the court to the effect that if the jury believed that the defendant and another or others formed a common intent and purpose to commit a crime *as charged in this indictment,* and should believe that in pursuance of such common intent such crime was actually committed, and should further believe that this defendant either committed the crime himself or was present aiding or abetting in the crime at the time it was committed, it would be their duty to convict him. Further, "If you find there was a conspiracy and that the defendant participated in the common intent and purpose to do what was done, and that which was done is that which is alleged in the indictment, then what was done by another person named in the indictment in pursuance of such common intent and purpose would be just as binding upon him as if he did the act himself." In addition it is complained that the court charged in effect that whatever was done in pursuance of the conspiracy would be just as binding upon the defendant as if he himself did it, and it would be quite immaterial except that the jury might consider that feature in returning their verdict. There is nothing in the exception which would warrant a reversal of the judgment overruling the motion for a new trial. It is true that the indictment charges murder in that the the four named defendants are accused of shooting C. A. Perry to death with a pistol, and, as contended by the defendants, the original conspiracy as confessedly proved and admitted did not include the killing of the cashier; but a conspiracy to commit robbery always includes tacit consent to kill the person to be robbed if necessary to accomplish the robbery. It is in the blood of every man to resist being forcibly despoiled of

his possessions. Many men through fear or prudence and care for their lives may not resist the outrage. The bandit who starts out to make a holdup does not plan to be defeated and captured if he fails in his quarry or if his own safety is endangered. The conspiracy to rob includes murder if murder be necessary for the purpose mentioned, and imputes to each conspirator the act and intent of his coconspirator if a homicide should result in the attempt to rob. The indictment might have been drawn so as to have detailed more fully the circumstances which gave rise to the killing. But that point could and should have been raised by demurrer. It can not be raised as a ground of a motion for new trial. As already brought out in the statement of facts, the defense rested upon the basis suggested in the ground of the motion for a new trial with which we are now dealing. The defendant's contention is that if he conspired, it was to do nothing further than hold up or rob the Bank of Kingsland, and that the actual shots were fired by Morrow. However, having conspired in an undertaking so violative of the law that death was reasonably probable, he consented to whatever might happen in the furtherance of the plot. Morrow's shot was as well the shot of the defendant. The court did not, for any reason assigned, err in the instructions. Upon this point, in a case where the proof of a conspiracy was not as strong as in the case at bar, this court imputed to Gore the shot fired by another in the killing of Cheek. *Gore* v. *State*, 162 *Ga.* 267 (134 S. E. 36).

For the reasons already stated, the court did not err in the instruction of which complaint is made in the eighth ground of the motion for a new trial. The charge complained of was adjusted to the facts of the case, and was not misleading. It was not necessary for the court to call to the attention of a jury of ordinary intelligence the fact that the killing of Perry occurred six or seven miles from the bank, for it is very plain from the record that the killing arose while the conspirators were proceeding in their plan to rob the bank by taking Perry back in terror to the bank and forcibly compelling him to aid them in entering the vault and obtaining the money. The conspiracy was still afoot; and it had reached a crisis when Morrow, in the presence and with the common intent of his colleagues, aimed his pistol at Perry and ordered him to "stick 'em up." In that act the defendant became the ag-

gressor. In jumping out with his knife Perry was acting in self-defense, as he had a right to do. In proceeding with their conspiracy to rob the bank Perry resisted as he had a right to do; and when they did not desist, the conspiracy to rob reached its climax in murder. The instruction was not error because the court omitted entirely the question as to whether the party actually killing Perry acted in self-defense. There are no facts in the evidence which would have authorized such an instruction.

■ In the ninth ground of the motion for a new trial complaint is again made that the court committed error in failing to charge on the question of whether or not under all the facts and circumstances the killing of Perry was murder or justifiable homicide. For the reasons just stated, this was not error under the facts of this case. In the tenth ground of the motion error is assigned because the court failed to charge the jury section 63 of the Penal Code of 1910. This ground has been dealt with in the case of *Morrow* v. *State,* supra, in which the same assignment of error is presented. Likewise the same exception was made, and has been ruled in *Morrow's* case, as is contained in the eleventh ground of the motion.

*Judgment affirmed. All the Justices concur except Russell, C. J., and Hines, J., who dissent.*