26561. CARTER v. THE STATE.

ARGUED JUNE 14, 1971—DECIDED JULY 9, 1971.

*Bruce W. Kirbo, Harold Lambert,* for appellant.

*A. Wallace Cato, District Attorney, Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, Courtney Wilder Stanton, Assistant Attorney General, W. Hensell Harris, Jr.,* for appellee.

UNDERCOFLER, Justice. Polk A. Carter was convicted of the murder of Jim Clark who died of arsenic poisoning on August 6, 1969. The defendant was sentenced to life imprisonment.

The evidence shows that Effie Bell Clark was the victim's wife. She and the victim had married in 1968 shortly after the death of her first husband. The defendant is her son-in-law. His wife is Pearl Bell Carter. Pearl Bell Carter had been instrumental in having her mother, Effie, committed to Milledgeville State Hospital in 1966 for a period of 20 days. After the death of her father in 1968 Pearl and the defendant pressured Effie into marrying the victim by threatening to send her back to Milledgeville if she refused. Effie was afraid of the defendant. After Effie married the victim, the defendant and Pearl wanted him to make a will so that Effie would receive his property at his death. They told Effie that he would be worth more to her dead than alive. They told her that if she did not "go along with this," they would send her back to Milledgeville. Effie testified that she heard the defendant and Pearl discuss "getting rid" of the victim. On Thursday, July 24, 1969, Effie and the victim ate dinner at the defendant's home. The defendant was not present at this time. He was a traveling salesman and was home only on weekends. Pearl sprinkled a pink powder on the victim's plate of chicken and he ate it. Effie thought the pink powder was spice but it was not put on anyone else's food. The following Saturday Effie and the victim again ate

dinner at the defendant's home and Pearl again put some of "that old pink-looking stuff" on some brunswick stew she served the victim. On this same day the defendant fixed the victim a drink of liquor and Effie testified that she saw the defendant put some pink powder in it. On their way home, the victim told her that he was sick at his stomach. The following Sunday the defendant and Pearl came to the victim's home and brought her husband some liquor which the defendant prepared for him. Effie and the victim spent the following Thursday night at the home of the defendant. The victim was sick and vomited all night, he told Effie early Friday morning he was going to die, and that there was no use in going to a doctor because "this winds me up." He was taken to the hospital in Cairo on Friday, August 1. On Saturday, August 2, the defendant called the victim's doctor and said the victim wanted to go home. The defendant and Pearl brought him home from the hospital wrapped in a sheet. He seemed improved to Effie but he was not at home very long before he became worse. He signed the purported will the day he was brought home from the hospital.

The evidence shows that the purported will of the victim, was written by Pearl, was edited by the defendant, and was executed under pressure of Pearl while the defendant stood behind a door listening; that the defendant thanked one of the witnesses for signing the will when he left the room; that the instrument provided that Pearl would have complete power of attorney over the property of the victim from the day of its execution and for the balance of his life; that after his death, she would have complete control of his estate; and that in the event she failed to function in any capacity, the defendant would exercise the powers granted to her.

The evidence shows that all insecticides and pesticides which contain arsenic are required by law to be colored pink.

Odel Clark, son of the victim, testified that he and his brothers lived in Florida. His sister, who lived in Cairo near the home of the victim, called him and told him that their father was sick and he and his brothers came to Cairo on Sunday morning. When they walked into the house, Effie picked up the telephone, dialed a number and said: "All the boys are here, all the boys are here" and then hung up the receiver. The victim told them he had been

poisoned, that he got his first dose in some chicken at the defendant's home and the second one in an alcoholic drink, and that his throat and stomach were burning. The victim asked Effie for a laxative to "work this stuff out of me" and she refused to give it to him. The victim went to bed and would not let his children help him.

Clifford Bell, a nephew, testified that on Wednesday, a week before the victim's death, the victim had called him at work and stated that he wanted to sell him his property. He told him that he did not know whether he would be able to get the money to buy it. The victim stated he wanted him to have the property so that he could be through with it. The witness later notified him that he would buy the property. When he saw his uncle again, the next Saturday, after he returned from the hospital, he was swollen and in pain. In the presence of Effie, the victim told him that he had been poisoned and that he was going to die. The next day, Sunday, he again visited his uncle and the defendant and Pearl were there. The defendant had his stethoscope and was examining the victim, mashing him in the stomach and neck to such an extent that the witness asked him to stop because he was hurting him. The defendant and Pearl gave the victim a dose of "medicine" while he was there which they said had been prescribed by Dr. Singleton. The doctor testified that he had not prescribed any medicine for the victim.

Other witnesses testified that the victim told them that he had received his "first dose" of poison in some chicken and another in an alcoholic drink at the home of the defendant and Pearl, that he had never been in such a condition in his life, that he had been pressured into signing a will, that the defendant and his wife were trying to get his money but he had fixed it so they would not, and that he was going to die. These witnesses also gave detailed evidence of his physical condition, and the fact that he was in extreme pain and believed that he was going to die.

One of his neighbors visited him on Monday before his death on Wednesday and found him in pain. The victim told him that he needed a doctor and something done for him. The neighbor arranged for him to go to the hospital in Thomasville that day.

The male attendant at the hospital in Thomasville testified that

he talked with the victim on Monday before his death on Wednesday, that the victim's mouth and throat were "eaten up" and his throat was swollen, that he could not swallow water, that he was distended and running off at the bowels, that he said he had been poisoned by the defendant and his wife, that he had been pressured into making a will, and that he was going to die.

The victim died on Wednesday from arsenic poisoning administered in a series of small non-lethal doses reaching a level of 2½ times the amount sufficient to cause death.

The defendant was sworn and testified in his own behalf. He related his educational training in biochemistry and related sciences and testified that with his knowledge in the scientific field that had he wanted to dispose of the victim that he would have employed other means than arsenic, which is so easily detectible. His testimony showed that he was an expert in the field of chemistry and had an extensive knowledge of heavy metal poisoning. He denied giving the victim arsenic or conspiring with anyone else to give it to him.

■ The appellant contends that the evidence is insufficient to support the verdict of guilty because "it is a case built entirely on circumstantial evidence, and the uncorroborated testimony of an accomplice. . ."

Although much of the evidence in this case is circumstantial, it is sufficient to support the verdict. It shows that the victim died of arsenic poisoning administered in a series of small non-lethal doses reaching a level of 2½ times the amount sufficient to cause death; that the defendant and his wife pressured the wife of the victim into marrying him for his money; that the wife of the victim saw the defendant and his wife putting pink powder in his food and drinks; that all pesticides and insecticides containing arsenic are colored pink; that another witness saw the defendant "doctoring" the victim and giving him purportedly prescription medicine when none had been prescribed for him; that the victim was pressured into signing a will five days before his death giving the wife of the defendant complete control of his property during his lifetime and after his death; that the defendant would have control of the property in the event his wife did not serve; that the defendant thanked one of the witnesses to the will; that the

declarations of the victim showed that he thought he had been poisoned by the defendant and his wife; and that the acts and motives of the defendant and his knowledge of heavy metal poisons are sufficient to support the verdict.

See *McNaughton v. State,* 136 Ga. 600 (71 SE 1038); *Driver v. State,* 194 Ga. 561 (22 SE2d 83); *Gossett v. State,* 203 Ga. 692 (1) (48 SE2d 71); *Clements v. State,* 214 Ga. 569 (1) (105 SE2d 725) and *Lyles v. State,* 215 Ga. 229 (5) (109 SE2d 785).

■ The appellant contends that the corpus delicti was not established. In *Warren v. State,* 153 Ga. 354 (2) (112 SE 283) this court held: "To sustain a conviction in a case of homicide, it is essential to prove the corpus delicti; that is, first, that the person alleged in the indictment to have been killed is actually dead, and second, that the death was caused or accomplished by violence, or other direct criminal agency of some other human being, that is, it was not accidental, nor due to natural causes, nor to the act of the deceased; and that the accused caused the death by one or more of the means charged."

The evidence in this case is sufficient to establish the corpus delicti.

■ The appellant contends that the trial court erred in admitting purported dying declarations of the deceased over his objections.

*Code* § 38-307 provides: "Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide."

A preliminary examination to determine whether the declarations of the victim were admissible was held. The male attendant at the hospital in Thomasville testified that he talked with the victim on Monday before his death on Wednesday, that the victim's mouth and throat were "eaten up" and his throat was swollen, that he could not swallow water, that he was distended and running off at the bowels, that he said he had been poisoned by the defendant and his wife, that he had been pressured into making a will, and that he was going to die. Other witnesses to whom the victim made statements from two to six days before his death testified that he said he had been poisoned by the defendant and

his wife, that he had never been so sick in his life, and that he told them he was going to die. The trial court allowed the declarations to be admitted into evidence.

"Where the foundation for such a declaration has been prima facie established, the evidence is properly admitted, and the ultimate determination as to whether the person making it was in articulo mortis and realized that death was impending is a matter for the jury. *Findley v. State,* 125 Ga. 579 (50 SE 106)." *Emmett v. State,* 195 Ga. 517, 533 (25 SE2d 9).

The declarations of the victim were properly allowed in evidence for the consideration of the jury.

■ The appellant contends that the trial court erred in its charge on the question of dying declarations for the reason that when charging the jury on the credibility of the alleged dying declarations of Jim Clark it was by reference and did not specifically and distinctly charge the rules of credibility that should be applied to the alleged statements of Jim Clark.

"While the testimony of a witness whose evidence goes to the jury through the medium of dying declarations is to be considered under the same rules that govern them in determining the credibility of other witnesses who testify from the stand, the failure of the judge to charge upon the subject of such rules will not be a sufficient reason for granting a new trial, in the absence of an appropriate and timely written request asking instructions upon the subject." *Hall v. State,* 124 Ga. 649 (2) (52 SE 891).

In the absence of a request, it was not error for the court to fail to charge on this subject.

■ The appellant contends that the trial court should have charged the jury on the necessity for corroboration of the testimony of an accomplice, even in the absence of a timely written request, where other evidence in the case did not demand a verdict.

"As the State did not rely wholly on the evidence of the alleged accomplice to connect the accused with the offense, it was not incumbent upon the court, without request, to instruct the jury touching corroboration." *Robinson v. State,* 84 Ga. 674 (1) (11 SE 544).

There is no merit in this contention of the appellant.

■ The court charged the jury: "In all criminal cases, such as this, the defendant enters upon his trial clothed with the presumption of innocence in his favor, and that presumption remains with him and shields and protects him throughout the trial of the case until and unless the State satisfies you with evidence to a moral and reasonable certainty and beyond a reasonable doubt of the guilt of the defendant and the State has the burden of producing such evidence."

The appellant contends that the charge was confusing and misleading to the jury in that it was suggestive that the quantum of proof required for conviction is something less than "beyond all reasonable doubt." There is no merit to this contention. *Bone v. State,* 102 Ga. 387 (1) (30 SE 845); *Etheridge v. State,* 187 Ga. 30, 39 (199 SE 185); *Morris v. State,* 200 Ga. 471, 483 (37 SE2d 345).

■ The appellant contends that the trial court erred in refusing to grant his motion for a verdict of acquittal upon the conclusion of the evidence.

At the time this case was tried there was no statutory authority for the direction of a verdict in a criminal case and it was not error for the trial court to refuse to direct a verdict. *Pritchard v. State,* 224 Ga. 776 (2) (164 SE2d 808). But see in this connection Ga. L. 1971, p. 461 (*Code Ann.* § 27-1802), which authorizes the direction of a verdict in a criminal case where there is no conflict in the evidence and where a verdict is demanded.

*Judgment affirmed. All the Justices concur.*