## 43029. KITCHENS v. THE STATE.

(342 SE2d 320)

BELL, Justice.

Kitchens was convicted of the murder of Jesse Jones and received a life sentence.[1] He appeals, and we affirm.

On November 25, 1984, at about 2:00 a.m., police officers responded to reports of a shooting incident on a road in Macon County, Georgia. One of the officers who arrived on the scene testified that he found Kitchens' truck and Jones' car parked in opposite lanes, facing each other approximately five feet apart. According to the officer, Kitchens told him that, "I'm tired of Jesse messing with the woman I love, and I went out to his house to get him."

Testimony was also admitted that Kitchens talked to one of his cousins while in jail and told him that he went out to the victim's house to kill him.

Jones suffered multiple gunshot wounds to the forehead, left arm, shoulder, neck, and back. One of the wounds to the neck damaged the spinal cord and left the victim a quadriplegic. Jones was originally

---

[1] The crime occurred on November 25, 1984, and Kitchens was indicted for murder on February 5, 1985. He was convicted on April 10, 1985, and sentence was imposed on April 11. Kitchens filed a motion for new trial on April 17, 1985. The transcript was certified by the court reporter on July 23, 1985. Kitchens amended his motion for new trial on September 3, 1985, and on October 11 the motion for new trial was denied. Kitchens filed a notice of appeal on October 30, 1985. The case was docketed in this court on December 9, 1985, and orally argued on February 11, 1986.

taken to the Macon County Medical Center. While in the emergency room, Jones made a statement concerning the shooting to Macon County Sheriff Charles Cannon. A few hours after the shooting, Jones was transferred to the Medical Center Hospital in Columbus. Jones died thirty-one days later, on December 26, 1984. During this latter period Jones made statements about the incident to his brother, William Jones, and to a friend, Joann Spillers.

Before trial Kitchens filed a motion in limine pursuant to which he sought to exclude from evidence the statements made by Jones to Sheriff Cannon, William Jones, and Joann Spillers. Following a pretrial hearing the trial court ruled that the statements could go to the jury under the dying declarations exceptions to the hearsay rule, OCGA § 24-3-6.

The statements which Jones made to Sheriff Cannon while in the Macon County Medical Center relate the following sequence of events: Jones said he was awakened about 2:00 a.m. by a motor running outside his house, and got up and went to the door. Kitchens was standing outside hollering at him. Jones said that he then put on some clothes, and went outside to his car. Kitchens had begun to drive away, and Jones followed Kitchens until Kitchens stopped, at which time Jones passed him. Kitchens then shot out Jones' rear window. Jones drove a short distance and turned around. As he did, Kitchens shot at him a second time, hitting the car. Jones then got out to get a rifle from his trunk, and Kitchens shot at him a third time, which apparently did not hit him. After he got the rifle from the trunk, a fourth shot was fired by Kitchens, which Jones said "knocked his lights out." Jones then fired his rifle at Kitchens three times, and, thinking that he had hit him, he drove to within a few feet of Kitchens' truck. Jones got out of his car, precipitating a fifth shot from Kitchens. Jones said he did not remember anything after that shot.

William Jones' testimony conveying Jesse Jones' dying declarations was substantially the same as Sheriff Cannon's, but differed in one material respect. William Jones testified that the victim told him that after he drove to within a few feet of Kitchens' truck and got out of his car, he was feeling dizzy and numb. The victim, according to William Jones, said that he fell to the ground and that Kitchens walked up to him and shot him in the back.

Joann Spillers testified that the victim also told her that Kitchens shot him in the back while he was lying on the ground next to his car.

Kitchens testified in his defense at trial. He stated that at the time of the shooting he was dating Jones' ex-wife, who was frequently harassed by Jones. Kitchens added that on the night of November 25, 1984, he went to the victim's home to confront him about that harass-

ment. He stated that he took his shotgun with him in case he needed to protect himself. Kitchens testified that once Jones came outside, Kitchens became scared and drove off, but that Jones followed him in his car. He testified that as Jones was overtaking him, he stopped and let Jones pass. Kitchens stated that Jones stopped his car thirty to forty yards in front of him and looked like he was starting to get out of the car with a weapon in his hand. Kitchens then shot out Jones' rear window. Jones then drove forward and started to turn around, at which time Kitchens shot at him a second time. According to Kitchens, after Jones turned around he fired a gun at Kitchens several times, and then started driving towards Kitchens' truck. Kitchens stated that he stepped off the road into a shaded area. He added that Jones stopped a few feet from Kitchens' truck, and got out of his car. Kitchens stated that Jones had a rifle and looked directly at Kitchens. Kitchens then shot Jones, who fell to the ground, but got back up almost immediately. Kitchens then shot at Jones again, who fell and did not get back up. Kitchens denied that he went to Jones' house to "get" him, and denied that he shot Jones in the back as he lay in the road.

1. In his first enumeration of error Kitchens contends that the evidence is insufficient to support the verdict. However, after reviewing the evidence in a light most favorable to the jury's verdict, we conclude that it was sufficient to authorize a rational trier of fact to find Kitchens guilty of murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his second enumeration of error Kitchens contends that the trial court erred in denying his motion in limine and in admitting the victim's statements into evidence as dying declarations.

OCGA § 24-3-6 provides that "[d]eclarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for homicide." Thus, Jesse Jones' statements were admissible if, first, he was "in the article of death" at the time the statements were made, and, second, he was aware that he was in the article of death. *Holcomb v. State*, 249 Ga. 658, 660 (292 SE2d 839) (1982).

"In determining whether the two-prong test of Code Ann. § 38-307 [now OCGA § 24-3-6] for admitting a hearsay statement as a dying declaration has been met, both the trial court and the jury are involved. The trial court must first determine whether prima facie the requirements of the Code section are satisfied. E.g., *Simpson v. State*, 168 Ga. 598 (2a) (148 SE 511) (1929); *Swain v. State*, 149 Ga. 629 (4) (101 SE 539) (1919). If the trial court determines that a prima facie showing has been made, the statement is admitted into evidence, and the jury makes the ultimate determination as to whether the declar-

4

ant was in the article of death at the time the statement was made and was conscious of his condition. E.g., *Carter v. State*, 227 Ga. 788, 794 (183 SE2d 392) (1971); *Emmett v. State*, 195 Ga. 517, 533-34 (25 SE2d 9) (1943), overruled on other grounds, *Howard v. State*, 237 Ga. 471, 474 (228 SE2d 860) (1976); *Findley v. State*, 125 Ga. 579 (1) (54 SE 106) (1906)." *Holcomb v. State*, supra, 249 Ga. at 660.

At the pretrial hearing to determine the prima facie admissibility of Jesse Jones' statements, deposition testimony from Dr. Glen Taunton, the treating physician at the Macon County Medical Center, and Dr. Jack Griffin, the treating physician at the Medical Center Hospital in Columbus, was admitted. Dr. Taunton testified that when Jesse Jones was brought to the emergency room at the Macon County Medical Center he was suffering from significant trauma and complete paralysis of all extremities. He testified that Jones was medically stable and did not need assistance breathing, but that it was necessary to insert a catheter to assist his bladder and kidney functions. He added that he informed Jones he was in serious condition, and that Jones was aware of his condition. According to Dr. Taunton, Jones was not in immediate danger of dying when he was brought to the emergency room, but he was in immediate need of attention by a neurosurgeon, and he was therefore transferred that night to the Columbus hospital.

Dr. Jack Griffin testified that based on his treatment of Jones during his first week at the hospital, it was his opinion that Jones would not achieve his normal life expectancy; that he could expect to live only a few years under the most diligent care; and that it was possible that he would die in a short period of time. Dr. Griffin felt that Jones was aware of his physical condition. According to Dr. Griffin, Jones developed respiratory problems soon after he arrived, and had difficulty talking. The complications which could arise because of the spinal cord injuries suffered by Jones were numerous and included respiratory problems, the constant possibility of pneumonia and infections, the loss of control of bowel and bladder functions, ulcers, and pulmonary embolism (blood clotting around the heart). Dr. Griffin's opinion was that Jones died of a pulmonary embolism caused by paralysis and cervical cord injuries.

At the pretrial hearing Sheriff Cannon testified that when he began questioning Jones at the Macon County Medical Center, Jones told him that he thought he had fought his last fight. In addition, William Jones testified that the victim told him that he knew he was in serious condition and was not going to make it; that he had made peace with God; and that he had wanted to tell William what had happened so that William would know it was not his fault. Joann Spillers also testified that Jones told her that he was not going to make it.

With regard to the statements made by the victim at the Medical Center Hospital in Columbus, we hold that the trial court did not err in concluding that the state made out a prima facie case that Jones was in the article of death and was aware that he was in the article of death at the time of those statements. We do so based on Dr. Griffin's testimony that Jones could die in a short period of time even under the most diligent of care, and on Dr. Griffin's, William Jones', and Joann Spillers' testimonies concerning Jones' awareness of his condition.

With regard to the statement made to Sheriff Cannon at the Macon County Medical Center, we reach a different conclusion. Because Dr. Taunton testified that Jones was medically stable and was not in immediate danger of dying, and the state presented no evidence to the contrary, we conclude that the state failed to carry its burden of prima facie establishing that Jesse Jones was in the article of death at the time he made the statement. However, we also hold that the trial court's error in admitting this statement was harmless because substantially the same evidence was properly admitted by way of the victim's statements to William Jones and Joann Spillers. *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976); *Lee v. State*, 247 Ga. 411 (1) (276 SE2d 590) (1981).

3. In his third enumeration Kitchens contends that the trial court erred in failing to charge the jury that it was ultimately their responsibility to determine whether the victim was in the article of death at the time he made his statements and whether he was conscious of his condition at that time.

Although the trial court in the instant case did charge the jury under what circumstances a statement may be admitted in evidence as a dying declaration, and that it was for the jury to determine what weight and credibility to give to the statements, Kitchens is correct that the court erroneously failed to charge the jury that it had to finally determine whether the statements were made while Jones was in the article of death, and whether Jones was conscious that he was in the article of death. See *Swain v. State*, 149 Ga., supra at 630-31 (5); *Holcomb v. State*, supra, 249 Ga. at 660. However, we conclude that such error does not warrant the grant of a new trial. Where the trial court fails to properly instruct the jury as to their consideration of statements preliminarily admitted by the court as dying declarations, the error " 'is not cause for a new trial, where the State does not rely for conviction solely on dying declarations, and where there is no appropriate and timely written request for instructions as to them.' " *Holcomb v. State*, supra, 249 Ga. at 661 (quoting *Thomas v. State*, 150 Ga. 269 (1) (103 SE 244) (1920)).

In the instant case, the defense did not file a request to charge on the specific issue at hand. Moreover, the state clearly did not rely

solely on the dying declarations for the conviction. In this respect the state introduced testimony that Kitchens told an officer at the scene that he went to the victim's house "to get him" because he was tired of the victim "messing with the woman I love," and that Kitchens also told a cousin that he went to the victim's house to kill him. For the foregoing reasons we conclude that the trial court's failure to give the particular charge at issue does not warrant the grant of a new trial.

4. As previously noted, William Jones testified on direct examination that Jesse Jones told him that he had "made peace with God." During cross-examination of William Jones, Kitchens' attorney asked him if Jesse had asked forgiveness for a specific act of violence allegedly committed by the victim against a third party. The state objected to the question, and the trial court sustained it.

In his fourth enumeration Kitchens contends that by sustaining the state's objection the trial court denied him his right to a thorough and sifting cross-examination of William Jones. He specifically contends that the line of questioning he was pursuing was relevant to determine the sincerity of the victim's statement that he had "made peace with God," which, he says, was a ground for admitting his statement to William Jones into evidence as a dying declaration.

It is well-settled that the scope of cross-examination rests largely within the discretion of the trial court, and that unless there has been an abuse of that discretion it will not be disturbed on appeal. *Hooks v. State*, 253 Ga. 141 (3) (317 SE2d 531) (1984). Jesse Jones' statement that he had "made peace with God" was relevant to show that he was conscious of his dying condition. Whether the victim had asked forgiveness for each "sin" he perceived he had committed was only peripherally relevant to the inquiry of whether he knew he was in a dying condition, and, considering the general proscription against attacking a murder victim's character by use of specific acts of violence against third parties, *Morris v. State*, 254 Ga. 273 (3) (328 SE2d 547) (1985), we find that the trial court did not abuse its discretion in limiting the cross-examination in question.

*Judgment affirmed. All the Justices concur, except Smith, Gregory and Weltner, JJ., who concur specially. Hunt, J., not participating.*

GREGORY, Justice, concurring specially.

I concur in the judgment of affirmance but write to indicate a different rationale for reaching the same result the majority reaches in Divisions 2 and 3. The rule heretofore followed in Georgia confuses the function of the judge with that of the jury in my opinion. Admissibility of evidence is to be decided by the judge. The weight to be given evidence, once admitted, is for the jury. Thus the judge must

decide those factual questions relating to a dying declaration, including the declarant's consciousness of approaching death. If the predicates to admissibility are met the judge allows the declaration into evidence. Then, it is for the jury to decide what weight shall be given the declaration. The decision of the jury on that matter is not a question of law governed by the rules for admissibility of dying declarations. Rather, the jury performs its usual weighing of evidence function taking all relevant circumstances into account as in other circumstances. V Wigmore on Evidence, § 1451, p. 317.

I am authorized to state that Justice Smith and Justice Weltner join in this special concurrence.

DECIDED APRIL 30, 1986 —
RECONSIDERATION DENIED MAY 13, 1986.

*Crisp & Oxford, Henry L. Crisp, Howard S. McKelvey, Jr.,* for appellant.

*John R. Parks, District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Staff Assistant Attorney General,* for appellee.