## S01A1613. MILLER v. THE STATE.
(561 SE2d 810)

HINES, Justice.

Andrew Tyrone Miller appeals his convictions for malice murder, possession of a firearm during the commission of a crime, possession of a firearm by a convicted felon, and theft by receiving stolen property, all in connection with the death of Ingret Miller, his wife. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Ingret's body was found in the driver's seat of her car, on a rural dirt road, with fatal gunshot wounds to the head, neck, chest, and abdomen from a 9 mm pistol. The body was found some time between 6:00 and 6:26 p.m. on January 3, 2000. Shoe prints from a men's size 12-13 athletic shoe were in the dirt around the scene. Miller wears a size 13 shoe.

Earlier that afternoon, at the house Miller shared with Ingret,

---

[1] Ingret Miller was killed on January 3, 2000. On January 25, 2000, Miller was indicted by a Lowndes County grand jury for malice murder, possession of a firearm during the commission of a crime, five counts of possession of a firearm by a convicted felon, and two counts of theft by receiving stolen property. Miller was tried before a jury April 2-6, 2001 and found guilty of all charges. On April 19, 2001, he was sentenced to life in prison for malice murder, five years in prison for possession of a firearm during the commission of a crime, five years in prison for each count of possession of a firearm by a convicted felon, and ten years in prison for each count of theft by receiving stolen property, all terms to be served consecutively. Miller filed his notice of appeal on May 21, 2001, the appeal was docketed in this Court on July 30, 2001, and submitted for decision on September 24, 2001.

he packed his belongings in his car. Around 4:00 to 5:00 p.m., Miller and Ingret left the house in her car. Miller was wearing a shoulder holster that afternoon. At 6:00 to 6:15 p.m., Miller returned in a different car driven by someone else, and emerged. He told Kyer, Ingret's daughter and his stepdaughter, to telephone Ingret on her cell phone and tell her to come home, but Kyer said she would not. Miller said he would make that call, went into the house, emerged, and began removing his clothes from his car.

Later that night, Miller picked up Evans, a girlfriend of his, and went to a motel, where Miller immediately took a shower. During the course of the evening, Miller stated that something was not right because Ingret had not paged him, as she frequently did. Miller then left to check on his children. He subsequently spoke with the police and turned over several firearms to them for ballistics testing, including one 9 mm handgun; Miller had been previously convicted of the felony of possession of cocaine. None of the weapons Miller provided proved to be the murder weapon. However, at a New Year's celebration at his home three days before, Miller and friends had shot three 9 mm handguns that Miller supplied. The police also learned that two of the weapons Miller turned over had been stolen.

1. Miller contends the evidence was insufficient to allow the jury to find him guilty of all charges. Specifically, he challenges the evidence of his possession of one of the handguns that supported the five counts of possession of a firearm by a convicted felon, a TEC-DC9. However, on the night of Ingret's death, Miller told police that he owned a "TEC-9," he gave police permission to check the ballistics on certain weapons, and when the police went to his home to collect those weapons, the TEC-DC9 specified in the indictment was one of them. He also told them that the weapon had been bought by Ingret. Miller contends that the TEC-DC9 was also registered with the Valdosta police in Ingret's name, although that registration is not in the record. However, at most that merely creates a question for the jury. The jury was correctly instructed as to actual and constructive possession, and could conclude from the evidence that Miller told police that he owned the TEC-DC9, gave permission for its use in a ballistics test, handed it to police for that purpose, and that he had the power and intention to exercise authority over the weapon. See *Farrier v. State*, 273 Ga. 302 (2) (540 SE2d 596) (2001); *Deering v. State*, 244 Ga. App. 30, 32 (2) (535 SE2d 4) (2000).

Miller also challenges the sufficiency of the evidence of theft by receiving stolen property, contending that there is no evidence that he knew, or should have known, that the two rifles specified in the indictment were stolen. See OCGA § 16-8-7. Knowledge that the property in question was stolen is an essential element of the crime of theft by receiving. *Harris v. State*, 239 Ga. App. 723, 724 (521 SE2d

864) (1999). The jury may infer that knowledge "from circumstances which would excite suspicion in the mind of an ordinary prudent man." (Citations and punctuation omitted.) *Parrott v. State*, 188 Ga. App. 564, 566 (373 SE2d 828) (1988). Miller's contradictory statements about how he came to possess the two rifles are such circumstances. Id. At one point, Miller told police he bought the rifles from a pawn dealer who had died three years earlier. He later stated that he got them from a man named Maynard, and that if the police arrested Maynard, they would "clear up a lot of robberies in Lowndes County." The character of the person from whom the goods are received is a factor from which the defendant's knowledge may be deduced. *Prather v. State*, 116 Ga. App. 696 (1) (158 SE2d 291) (1967). See also *Wilson v. State*, 211 Ga. App. 791, 793 (3) (440 SE2d 534) (1994). Miller's inconsistent explanations, together with his knowledge of Maynard's character, authorized the jury to infer that he had knowledge of the stolen nature of the rifles so as to satisfy the requirement of OCGA § 16-8-7.

The evidence authorized the jury to find Miller guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Three witnesses were allowed to testify to statements Ingret made in the weeks before her death, under the necessity exception to the hearsay exclusion rule. OCGA § 24-3-1 (b). For such testimony to be admissible, the declarant must be unavailable, and the statement must have particularized guarantees of trustworthiness. *Abraha v. State*, 271 Ga. 309, 313 (2) (518 SE2d 894) (1999). Miller contends that these guarantees were lacking as to all three statements.

(a) Jackson, Ingret's aunt, related an incident that occurred approximately two months before Ingret's death. She testified that she saw Ingret nearly every day as Jackson kept Ingret's children in the afternoon. She had known Ingret since she was born and they confided in each other, although Ingret did not often speak of her problems with Miller because Jackson would advise her to leave the relationship. Jackson had never known Ingret to tell her anything that was not true. Prior to admitting Jackson's recounting of what Ingret said during the incident, Jackson related that Ingret had arrived at Jackson's home, banged loudly on the door, and that she was soon followed by Miller, driving in haste, who jumped out of his car, appeared to be angry and to "be after" Ingret. Jackson testified that Ingret asked to be let in because Miller had been shooting at her. Miller asked to speak to Ingret, but she would not come outside the house.

This evidence of a prior difficulty between Miller and the victim was admissible as guarantees of trustworthiness were present. Not only was Jackson a close relative in whom Ingret confided, see

*Thomas v. State*, 274 Ga. 156, 163 (8) (549 SE2d 359) (2001), but the behavior of Ingret and Miller at the time of Ingret's statement was consistent with that statement.

(b) Pratt, a former police officer, testified that on December 29, 1999, she responded to a call at the Millers' home. There she observed that the back door to the home was damaged and the framing around the door was cracked, and that clothes appeared to have been taken from drawers and strewn about the floor. Over Miller's objection, Pratt testified that Ingret said that: she and Miller had an argument; she asked Miller to leave the house, and that he agreed, gave her his keys, and left; the next day she called the home to check on her children and Miller answered the telephone; she returned home to find the back door broken; Miller had thrown all of her clothing out; she was tired of Miller's bringing women into the house and into her bed while she was at work; and she wanted Miller out of the house. Miller was present when Ingret made these statements. After Pratt pulled Ingret aside, Ingret said that Miller had guns in the house and that she did not want to go to a shelter. When Pratt left, Miller and Ingret were discussing "civil matters" such as the house and furniture.

"A statement made to a police officer during the course of an investigation has been deemed reliable when it was made shortly after the incident to which it related or shortly after the declarant was contacted by police concerning the incident." *White v. State*, 268 Ga. 28, 30 (2) (486 SE2d 338) (1997). Although Miller questions the reliability of the statement because it was made in the midst of a domestic argument, that does not show the statement to be unreliable. Miller was present when Ingret made the statements and did not hesitate to speak when he wished. Further, Ingret did not attempt to press any charges against Miller, indicating that she was not fabricating her statements to Pratt in an attempt to have him removed from the house.

(c) Kyer testified to statements made by Ingret on December 25, 1999 to the effect that Ingret had that day followed Miller and Evans, and that Ingret was tired of Miller's philandering and would get a divorce.[2] Although Miller contends that the statement is not reliable

---

[2] Miller contends it was error for the court, outside the jury's presence, to ask the witness questions which established the indicia of reliability, but he failed to object to the procedure at trial and has waived appellate review of the issue. *Gulley v. State*, 271 Ga. 337, 346 (11) (519 SE2d 655) (1999). He also contends that establishing the indicia of reliability away from the jury deprived it of the opportunity to evaluate the credit to be given the testimony, but Miller was free to cross-examine the witness on any such matters. Although he argues that the evidence given by Kyer was not necessary because it was the same evidence given by Pratt, that is obviously not the case; the two witnesses testified to different statements of Ingret's from different days, with different contents.

because Ingret may have been attempting to elicit the sympathy of her daughter, the evidence showed that Kyer had always lived with her mother, shared confidences with her nearly every day, that Ingret never recanted things she told Kyer in confidence, and that Kyer had never found anything Ingret told her in confidence to be untrue. Indicia of reliability were sufficient to allow the introduction of this testimony. See *Thomas*, supra.

3. During the testimony of the Millers' neighbor Smith, the State showed her a copy of the police summary of the statements she made to the police on the day of the shooting. Miller contends this is an impermissible use of hearsay. However, any document may be used to refresh the recollection of a witness, and the document need not have been prepared by the witness. OCGA § 24-9-69; *Woods v. State*, 269 Ga. 60, 62-63 (3) (495 SE2d 282) (1998). And Smith did not simply repeat the statements summarized by the police; after she looked at the report, she testified that her recollection was that Miller came to her house "about 6:30 or 7:00."[3] The State properly refreshed Smith's recollection, and there was no error.

4. Walker, a woman with whom Miller was sexually involved and who had a child by him, testified as a State's witness to the actions of Evans, who appeared to be jealous of Walker's involvement with Miller; Evans telephoned Walker and also made a public commotion expressing her jealousy. Walker also testified that on the day Ingret was killed, she spoke with Miller twice on the telephone while she was at her mother's home.

During the time of the investigation into Ingret's death, Walker had been implicated in Miller's drug activity and incarcerated on a $201,000 bond. On at least three occasions on cross-examination, Miller sought to ask Walker about statements made to her by police officers, including that she was told they would "turn her world upside down," if she did not admit that she had driven to the area where Ingret's body was found and picked up Miller. Walker testified she did not pick Miller up. The court sustained the State's objection on hearsay grounds. In advocating the admission of the evidence, Miller argued that Walker had consistently told police that she had not gone to pick up Miller after the murder, and showing the jury that she had resisted coercive pressure to admit to such a fact "bolsters her credibility." Miller is correct that, for such a purpose, the statements would not be hearsay as they were not offered for the truth of the matters asserted, but for the effect, or lack thereof, on the hearer. See *Livingston v. State*, 271 Ga. 714, 720 (5) (524 SE2d

---

[3] On cross-examination, Miller attempted to impeach her with two documents containing police summaries of her statements that night, one which stated Miller came over at 5:30 to 6:00 p.m., and one which stated he arrived at 6:00 to 6:30 p.m.

222) (1999). However, that does not necessarily render those statements admissible. A lower court's ruling that is right even for a reason different than that relied on by the court will be affirmed. *State of Ga. v. Cafe Erotica*, 270 Ga. 97, 101 (507 SE2d 732) (1998); *Blige v. State*, 264 Ga. 166, 168 (3) (441 SE2d 752) (1994).

"Unless a witness's veracity has affirmatively been placed in issue, the witness's prior consistent statement is pure hearsay evidence, which cannot be admitted merely to corroborate the witness, or to bolster the witness's credibility in the eyes of the jury." (Citations omitted.) *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998). Here Walker's veracity had not been questioned on direct examination. Compare *Blackmon v. State*, 272 Ga. 858, 859 (2) (536 SE2d 148) (2000). Consequently, any prior statements consistent with her testimony were not admissible, and the trial court did not err in refusing to admit the circumstances surrounding any such statements.

Further, substantially what Miller wished to show was admitted into evidence. Walker testified that police confronted her with what they claimed was Miller's implication of her in his drug trade, and that the officers told her she should "save herself" and "join the winning team" and tell them that she had picked up Miller, but that Walker had refused to say that because it was not true, that she was placed on $201,000 cash bond, that the decision to make the bond cash only was made by police officers, and that during the three weeks she was in custody, she continued to insist that she had not picked Miller up. Walker also told the jury that police officers had testified at her eviction hearing and that "they've made [trouble] for me already at school and stuff."[4] Thus, even if error, the failure to allow the desired evidence was harmless. *Kitchens v. State*, 256 Ga. 1, 5 (2) (342 SE2d 320) (1986).

5. Finally, Grantham testified that on the day Ingret was killed, he was installing a floor in the home of Walker's mother, and overhead Walker while speaking on the telephone say "Clay Road,"[5] and that Walker then left the house for 30 minutes. Miller contends that the court should not have allowed Grantham to answer the State's question about whether he was telling the jury the truth "here today." However, this question and answer occurred after Miller had attempted to impeach Grantham with the following facts: in a March 1, 2000 statement to police, Grantham did not say anything about

---

[4] Miller also told the trial court that he wished to show that officials at Walker's children's school told Walker that the police had placed telephone calls to the school, but as the trial court correctly noted, any such testimony from Walker would be hearsay.

[5] Evidence showed that Clay Road was located on a possible travel route between the location of Ingret's body and the Millers' home.

Walker leaving the house on January 3; Grantham was arrested for drug possession on March 16; on May 12, 2000, he was interviewed again by police and told them that Walker had left the house on January 3; and he received a probated sentence on the drug charges on May 12. "Normally, a party may not bolster the veracity of its own witness until the witness has been impeached by the adverse party. *Hamilton v. Conyers*, 28 Ga. 276 (1859)." *State v. Braddy*, 254 Ga. 366, 367 (330 SE2d 338) (1985). That is what occurred here, and there is no error. See also *Davis v. State*, 266 Ga. 801, 803 (5) (471 SE2d 191) (1996); *Loomis v. State*, 78 Ga. App. 153, 167 (8) (51 SE2d 13) (1948).

*Judgments affirmed. All the Justices concur, except Fletcher, C. J., who concurs in Divisions 1, 2a, 3, 4, 5, and in the judgment.*

DECIDED MARCH 28, 2002.

*J. Converse Bright*, for appellant.

*J. David Miller, District Attorney, Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.