## S08A1554. BARNETT v. THE STATE.
### (671 SE2d 823)

SEARS, Chief Justice.

The appellant, George Barnett, who is also known as "Cabo," appeals from his conviction for malice murder stemming from the shooting death of James Graham.[1] On appeal, Barnett contends that the trial court erroneously admitted out-of-court statements made by the victim. We find no error, however, and affirm.

1. Barnett and Donnell Coleman were jointly indicted for the crimes in question, but in January 2002, Coleman pled guilty to hindering the apprehension of a criminal, and the other charges against him were dropped.

At trial, Coleman testified that on May 3, 2001, he was released from a Mississippi jail after being convicted for writing a bad check. Coleman returned to Georgia and asked Barnett to help him collect $2,000 he had paid the victim's brother, John Graham, for cocaine that turned out to be fake. Between 10:30 p.m. and 11:00 p.m. on May 24, 2001, Barnett and Coleman drove to a home in which they believed John Graham lived. However, John Graham's brother, James, lived in the house. Coleman knocked on the door, and the victim answered and told Coleman that John did not live there. Coleman returned to the car and told Barnett that John Graham did not live there and that the person that did would not open the door. Barnett stated he would show Coleman "how this is done." Barnett then grabbed his pistol, exited the vehicle, and ran towards the victim's front porch. Coleman stayed by the trunk of the car. He saw Barnett and the victim charge each other and engage in a fight. The victim began running away, and, according to Coleman, Barnett shot the victim in the head. Coleman and Barnett left the scene, and

---

[1] The crimes occurred on May 24, 2001. On October 2, 2001, Barnett was indicted for malice murder, felony murder, aggravated assault, and the possession of a firearm during the commission of a felony. On April 24, 2002, a jury found Barnett guilty on all counts, and on May 15, 2002, the trial court sentenced Barnett to life in prison for malice murder and to five concurrent years for the possession offense. The felony murder conviction was vacated as a matter of law, and the trial court merged the aggravated assault conviction with the murder conviction. Barnett filed a motion for new trial on May 29, 2002, and an amended motion for new trial on April 17, 2007. The trial court denied the motion for new trial, as amended, on March 26, 2008, and Barnett filed a notice of appeal on April 3. The appeal was docketed in this Court on May 23, 2008, and was subsequently submitted for decision on the briefs.

Barnett drove to a house where he left his .38 caliber revolver. Barnett then drove off at a high rate of speed and had an accident. Barnett and Coleman left the car by the side of the road and eventually fled the State.

Four days after the shooting, on May 28, 2001, Graham died of complications from a gunshot wound to the head. The medical examiner testified that a bullet had traveled through the top of Graham's head, making entry and exit wounds. The top of Graham's skull was fractured and bone fractures were pushed into the brain cavity. As a result, a blood vessel located under the skull clotted and caused Graham's death.

A friend of the victim, Eric Johnson, testified that, on the night of May 24, 2001, he was on the phone with a female friend at the victim's apartment when he heard a car pull up. The victim had a three to five minute conversation with someone on the porch. Five to seven minutes later, there was another knock on the door, and the victim stepped outside. After two to three minutes, Johnson heard the victim say, "Hold up, man. Wait a minute. What you doing?" Johnson then heard two gunshots. Johnson ran outside where he saw the shooter, a white male, get into the front passenger seat of a car. Someone was sitting in the driver's seat, and the two drove off in the car. Johnson could not identify either the passenger or the driver. Johnson found the victim lying face down, bleeding from the back of his head, and Johnson called 911. The 911 operator told Johnson to get some towels and apply pressure to the victim's head and to hold his head up so that if he vomited, he would not choke. The victim told Johnson, "Cabo shot me. If I ain't able to tell the ambulance people when they get here, then make sure you tell them that Cabo shot me. He's the one that shot me."

Investigator Harold Bramlett responded to the crime scene in about 23 minutes, and an ambulance was there when he arrived. Bramlett knew the victim and climbed into the ambulance to check on his condition. According to Bramlett, the victim had on an oxygen mask and was being treated by medical technicians. The victim raised up off the stretcher, pulled off his oxygen mask, and said, "Harold, Cabo shot me." According to Bramlett, there was blood on the sidewalk, blood on a door on the porch that Graham had leaned against after he was shot, large amounts of blood on the porch, some rags soaked in blood, and a sofa cushion soaked in blood. Bramlett conducted a search of Barnett's wrecked car and discovered forty-six .38 caliber cartridges.

Deputy Brad Robinson went to the hospital to interview the victim shortly after 11:00 p.m. The victim told Robinson that Cabo had shot him, and he described Cabo as a "crazy redneck" who is "45 to 50 years old" and "lives in Hewlett."

Teresa Walthal lived next door to Graham and heard the gunshots on the night in question. After calling the police, she and her boyfriend went outside and saw Graham on the ground. Walthal testified that Graham was "gurgling in a pool of blood," that he could "hardly talk," and that he kept passing out.

Having reviewed the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found Barnett guilty beyond a reasonable doubt of the crimes for which he was convicted.[2]

2. Barnett contends that the trial court erroneously admitted the victim's statements to Johnson and Bramlett as dying declarations. We disagree.

At a hearing on the motion to exclude Graham's out-of-court statements, Bramlett and Dr. Paul, the emergency room doctor who treated Graham, testified. Dr. Paul testified that Graham was "unbelievably neurologically intact given the extent of the potential devastation of his injury. Gunshot wounds to the head don't usually present with vital signs." He added that Graham was conversant and lucid, and that, although he did not believe Graham was going to die while he was treating him, anyone who has a gunshot wound to the head is critical. Dr. Paul did not ask Graham whether he was in fear of death, but he said Graham appeared to be scared and concerned about what had happened. Dr. Paul tried to reassure Graham about his condition, telling him that he was "lucky under the circumstances to be in the medical condition that he was in." Dr. Paul immediately transferred Graham to an intensive care unit in Atlanta. According to Dr. Paul, a bullet went through the top of Graham's head, shattering the skull and causing bleeding in the brain. Graham's CT scan revealed bone and bullet fragments in Graham's head.

Bramlett also testified at the hearing, stating that he received a call to go to the crime scene at 10:37 p.m. and that he arrived there at 11:00 p.m. At that time, Graham was being treated in an ambulance and his shirt was covered in blood. Bramlett also said that there was a significant amount of blood at the crime scene. The trial court admitted the victim's statements to Johnson and Bramlett as dying declarations.

For a deceased's out-of-court statement to be admissible as a dying declaration,

[i]t need only appear to the court from the circumstances of the case that there was a probability that the deceased was

---

[2] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

conscious of his condition at the time he made the statement. The testimony . . . need not contain any statement by the deceased to the effect that he was conscious of impending death at the time the declarations were made, since this may be inferred from the nature of the wounds and other circumstances.[3]

The record shows Graham knew he had been shot in the head and knew he was bleeding heavily. The evidence indicated that he was gurgling in a pool of his own blood and could barely speak. There were large amounts of blood on the sidewalk and porch, and several rags and a sofa cushion were soaked with blood. Graham needed an oxygen mask in the ambulance, and his statement to Johnson shows that he was aware of the seriousness of his condition and thought he might not survive.[4]

Although the emergency room doctor did state that Graham was lucky considering he had suffered a gunshot to the head and that he did not believe Graham would die under his short-term care, he also stated that anyone who has been shot in the head is in critical condition.[5] Reflecting the doctor's concern about the severity of Graham's situation, the doctor immediately transferred Graham from the smaller community where he had been shot to an intensive care unit in Atlanta. In addition, neither the fact that the doctor reassured the victim about his condition[6] nor the fact that the victim survived four days after the shooting preclude the admission of his statements as dying declarations.[7]

For the foregoing reasons, we conclude the trial court did not err in admitting Graham's statements to Johnson and Bramlett as dying declarations.

---

[3] *Ventura v. State*, 284 Ga. 215, 217 (663 SE2d 149) (2008) (quoting *Woodard v. State*, 278 Ga. 827, 829 (607 SE2d 592) (2005)).

[4] See *Early v. State*, 170 Ga. App. 158, 161 (316 SE2d 527) (1984) (nature of victim's statement supported inference that she believed herself to be dying).

[5] Compare *Kitchens v. State*, 256 Ga. 1, 5 (342 SE2d 320) (1986) (where doctor testified, seemingly without qualification, that victim was medically stable).

[6] See *Morgan v. State*, 275 Ga. 222, 224-225 (564 SE2d 192) (2002) (officer's assurance to declarant that doctor was treating him and he would not die did not render statement inadmissible).

[7] See *Johnson v. State*, 169 Ga. 814, 823-824 (152 SE 76) (1930) (admissibility of declaration does not depend upon length of time between declaration and death of the declarant, but upon declarant's mind at the time of declaration). Accord *Emmett v. State*, 195 Ga. 517 (25 SE2d 9) (1943) (declaration made three and one half months before death was admissible), overruled on other grounds, *Howard v. State*, 237 Ga. 471 (228 SE2d 860) (1976); *Miles v. State*, 182 Ga. 75, 76 (185 SE 286) (1936) (declaration made 33 or 34 days before death was admissible).

3. Barnett contends the trial court erred in admitting Graham's statement to Deputy Robinson under the necessity exception to the hearsay rule. We conclude, however, that even if the declaration to Deputy Robinson was inadmissible, its admission was harmless given the fact that it was cumulative of the statements made to Johnson and Bramlett.[8]

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 12, 2009.

*Leigh S. Schrope, Jimmonique R. S. Rodgers, Sheueli C. Wang,* for appellant.

*Peter J. Skandalakis, District Attorney, Tara M. Wilson, Anne C. Allen, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Elizabeth A. Harris, Assistant Attorney General,* for appellee.

---

[8] *Chapman v. State,* 280 Ga. 560, 560-561 (629 SE2d 220) (2006); *Gay v. State,* 279 Ga. 180, 183 (611 SE2d 31) (2005).