S04A1326. WALTON v. THE STATE.

(603 SE2d 263)

HINES, Justice.

Demond Anthony Walton appeals his convictions for malice murder and possession of a firearm during the commission of murder in connection with the fatal shooting of Burundi Hill. He challenges the sufficiency of the evidence and the admission of evidence under the dying declaration and necessity exceptions to hearsay. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that Burundi Hill shared an apartment in Cobb County with his brothers Tamar Hill and Jasmaine Hill. On September 2, 2002, Jasmaine invited his two brothers to a barbecue at the apartment complex, hosted by Darnell Jones, known as "DJ" and his girlfriend, Shennetta Clay, known as "Netta." Also at the party were Christoper Ealey, known as "KP," Lorenzo Windham, Windham's girlfriend, September Parker, and Demond Walton, known as "8.0." Burundi met Walton for

---

[1] The crimes occurred on September 2, 2002. On January 10, 2003, a Cobb County grand jury indicted Walton, along with Christopher Shawn Ealey and Lorenzo Lonzeli Windham, for Count 1 – malice murder; Count 2 – felony murder while in the commission of aggravated assault; and Count 3 – possession of a firearm during the commission of murder; Walton was additionally indicted for Count 4 – possession of a firearm by a convicted felon. Walton, Ealey, and Windham were tried before a jury May 12-21, 2003. Ealey and Windham were acquitted of all charges against them. Walton was found guilty on Counts 1, 2, and 3; an order of nolle prosequi was entered on Count 4. On May 21, 2003, Walton was sentenced to life imprisonment on Count 1 and a consecutive five years in prison on Count 3. Count 2 stood vacated by operation of law. A motion for new trial was filed on June 19, 2003, and the motion was denied on March 9, 2004. A notice of appeal was filed on March 22, 2004, and the case was docketed in this Court on April 14, 2004. The appeal was orally argued on July 12, 2004.

the first time and the two discussed their mutual interest in basketball, and then they argued about it. Burundi and Tamar decided to leave the party, but KP urged Burundi to stay and go somewhere else with him. Burundi hugged and kissed Tamar goodbye and told him that he would be home soon.

Once home, Tamar received a series of telephone calls, including one from Ealey asking to speak to Jasmaine; Ealey sounded angry. But Burundi got on the telephone and assured Tamar that everything was okay and that he would be home "in a minute." Shortly thereafter, Tamar received a telephone call from Netta informing him that Burundi had been shot. Tamar and Jasmaine grabbed a shotgun and rushed to DJ's apartment, the scene of the barbecue. There they found Burundi lying on the ground; Burundi was writhing in agony. Tamar observed that "blood was everywhere and [Burundi] was saying that he was in a lot of pain and hot and just wanted to leave, get away from here, go home and like he was dying."

Jasmaine asked Burundi who shot him. Burundi replied that he was shot by "the n_ _ _ _ _ that was in the car with KP." Unsure of whom his brother meant, Jasmaine questioned him further, and by process of elimination by naming others who had been in the car, asked if it was Walton. Burundi stated that it was Walton who shot him. Burundi was then taken by ambulance to the hospital; his condition was very poor, and he died during surgery.

Burundi had sustained four gunshot wounds; two bullets had penetrated the central area of his back. The trajectory of the bullets and the lack of any stippling pattern on the body or clothing indicted that the gunman fired from more than three feet behind Burundi and that Burundi had been moving away from his attacker.

The police found a live round at the trail of expended cartridges at the scene of the shooting. They then recovered the murder weapon, a Glock .40 caliber pistol, from Windham's vacant apartment. The pistol belonged to Ealey, and Ealey's friends and acquaintances knew that he carried it. The fact that the shooter unnecessarily ejected a live round indicated that the shooter was unaware that there was already a bullet in the chamber of the pistol.

On the day of the murder, another resident at the apartment complex, Zanou Gomez, loaned his car to Kevin Jones, who shared an apartment with Windham's girlfriend, September Parker. When Gomez went to retrieve his car from Jones, he learned that Jones had given the car key to Parker. Walton and Windham had fled the murder scene in Gomez's car. Upon discovering that his car had been used as a getaway car in a murder, Gomez called 911 from outside Windham's apartment. As Gomez spoke to the dispatcher, Walton and Windham drove up in Gomez's car. Walton's brother, Roger Walton, also appeared at the front of the apartment complex. Walton

stated that he just shot somebody but that his brother had nothing to do with it; his confession was recorded on the 911 tape. The police arrived on the scene. As Walton lay detained on the ground, he discarded a 9mm magazine for an automatic pistol under the rear bumper of Gomez's car. Walton's clothing and belongings were found packed and waiting in Windham's apartment.

1. Walton contends that the trial court erred in admitting as a dying declaration[2] the evidence of Burundi Hill's statements to his brother Jasmaine regarding the identification of the shooter because the admission violated his rights of confrontation under the State and Federal Constitutions. Citing *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004), he argues that the Sixth Amendment's Confrontation Clause prohibits the admission of testimonial out-of-court statements against a defendant unless the defendant has been provided an opportunity to confront the witness.

But at trial, Walton did not object to admission of the evidence as violative of his rights of confrontation. Rather, he argued against the reliability of the dying declaration and the credibility of Jasmaine Hill. There is a distinct difference between a challenge to the admission of evidence based upon the Confrontation Clause and that based upon an exception to the hearsay rule. *Yancey v. State*, 275 Ga. 550, 551-557 (2) (570 SE2d 269) (2002).

Although the rules concerning the Confrontation Clause and

> hearsay evidence generally protect similar values, they do not always prohibit the same evidence. The Confrontation Clause may bar the admission of some evidence that would be admissible under an exception to the hearsay rule. "The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied."

Id. at 557 (3). Consequently, Walton's failure at trial to raise an objection to the admission of the evidence under the Sixth Amendment precludes consideration of the issue on appeal. *Borders v. State*, 270 Ga. 804, 809 (4) (a) (514 SE2d 14) (1999). It should be noted, however, that the United States Supreme Court, in *Crawford v. Washington*, declined to extend its holding to dying declarations. Rather, the Court, in its historical analysis, acknowledged that admission of a dying declaration was an exception to the general rule

---

[2] See OCGA § 24-3-6.

that a prior opportunity to cross-examine was a necessary condition for admissibility of testimonial statements. 124 SC at 1367.

In fact, the Court, went on to state that "[t]he one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. . . . Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are." Id. at 1367, n. 6.

In argument, Walton further asserts, as he did below, that Burundi Hill's dying statements were unreliable and that the credibility regarding Jasmaine Hill's testimony about the statements was in question. But after the trial court determines that a prima facie showing has been made and the deceased's statement is admitted into evidence, it is for the jury to make the ultimate determination as to whether the declarant was in the article of death at the time the statement was made and was conscious of his condition. *Kitchens v. State*, 256 Ga. 1, 3 (2) (342 SE2d 320) (1986). Here, the circumstances of Burundi Hill's gunshot wounds, agonizing pain, and death shortly thereafter established a prima facie showing for the admission of his statements as his dying declaration. *Morgan v. State*, 275 Ga. 222, 224 (5) (564 SE2d 192) (2002). As for Jasmaine Hill's testimony, he was subject to extensive cross-examination, and his credibility was a matter for the jury to resolve. OCGA § 24-9-80.

2. At trial, Fowler, a police officer with the City of Marietta who investigated the shooting, testified about an interview he had with the defendant's brother, Roger Walton, the morning after the shooting. Roger Walton had invoked his privilege not to testify regarding the night in question,[3] and the trial court allowed Fowler's recounting of the interview with him under the necessity exception to the hearsay rule.[4] Walton contends that the trial court erred in admitting Fowler's testimony under the necessity exception because it "used an objectionable process to cast guilt on [Walton], specifically that he

---

[3] At trial, Roger Walton's choice not to testify was discussed in terms of the privilege accorded under OCGA § 24-9-27 (a), which states:

No party or witness shall be required to testify as to any matter which may criminate or tend to criminate himself or which shall tend to bring infamy, disgrace, or public contempt upon himself or any member of his family.

[4] Fowler testified that Roger Walton said: he was in bed around 2:00 a.m. when he received a call from his brother Demond, explaining that he needed a ride to pick up his kid and his girlfriend; Demond "really" wanted Roger to help him; Roger told Demond not to come to his house because he had someone there that he did not want Demond to come into contact with, but Demond showed up anyway; Demond telephoned their sister from Roger's house and she yelled at Demond, "blaming him for somebody running into her apartment"; Roger left with Demond and went to Marietta; Roger did not know why they went to the apartment complex where Demond was apprehended; and when the police arrived, Roger thought there was a robbery; Roger heard the guy in the other vehicle yelling "get out of my car"; Demond was speaking in a way so as to not let Roger hear what he was saying.

had some nefarious reason for visiting his brother although the prosecution offered no proof of wrongdoing." Walton also reasserts his argument in Division 1 regarding the violation of his right of confrontation to the extent that it applies to the necessity exception to the hearsay rule.

Here again, Walton did not object at trial on confrontation grounds; he objected simply on the basis that the testimony was hearsay. Consequently, he cannot now for the first time raise an issue regarding a violation of his right of confrontation. *Borders v. State*, supra at 809 (4) (a). Even assuming that the issue was properly before this Court for review under the analysis of *Crawford v. Washington*, admission of the evidence under the necessity exception would fail to provide a basis for reversal of Walton's convictions. The admission must be found harmless because there is no reasonable possibility that the evidence contributed to the verdict. *Moody v. State*, 277 Ga. 676, 680 (4) (594 SE2d 350) (2004). The evidence was merely as to collateral matters and did not touch upon the central issue in the case. *Myers v. State*, 275 Ga. 709, 712 (2) (572 SE2d 606) (2002). Nor did it demonstrate a "nefarious" motive on the part of Walton. Moreover, much of Fowler's recollection merely echoed, and therefore, was cumulative of other admissible evidence. *Rowe v. State*, 276 Ga. 800, 803 (2) (582 SE2d 119) (2003); *Vaughns v. State*, 274 Ga. 13, 15 (3) (549 SE2d 86) (2001).

3. Lastly, Walton contends that the trial court erred by refusing to grant his motion for a new trial because the evidence was insufficient to support the convictions; he questions perceived conflicts in the evidence, the credibility of certain witnesses, and the admission into evidence of the victim's dying declaration. However, Walton's challenge to the admission of the dying declaration has been found to be unavailing. See Division 1, supra. What is more, "[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." *Mickens v. State*, 277 Ga. 627, 629 (593 SE2d 350) (2004). The evidence was sufficient to enable a rational trier of fact to find Walton guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgments affirmed. All the Justices concur, except Fletcher, C. J., who concurs in Divisions 2 and 3, and in the judgment.*

DECIDED SEPTEMBER 27, 2004.

*Richard O. Allen*, for appellant.

*Patrick H. Head, District Attorney, Amy H. McChesney, Assistant District Attorney, Thurbert E. Baker, Attorney General, Raina Nadler, Assistant Attorney General*, for appellee.