A05A0447. VERLANGIERI v. THE STATE.
(615 SE2d 633)

ANDREWS, Presiding Judge.

Joseph A. Verlangieri, convicted of homicide by vehicle, DUI, serious injury by vehicle, and reckless driving, appeals from the trial court's denial of his motions for new trial and for extraordinary new trial.

On appeal from a criminal conviction, the evidence is viewed in a light most favorable to the verdict. We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stone v. State*, 248 Ga. App. 190 (546 SE2d 787) (2001).

So viewed, the evidence was that, on January 31, 1999, Jason Smith and Eric Maples, members of a swim team, attended a party for the team which was seeking new members. Smith met Maples at Maples' home in Vinings and they went to the party in Atlanta in Maples' silver Pontiac Grand Am. Following the party, Smith and Maples picked up Barry Golivesky at his home off Collier Road and went to a Midtown club, Fusion, on Amsterdam Avenue. The three men left the party at approximately 2:15 on the morning of February 1, with Maples driving. Golivesky asked Maples if he were able to drive and Maples answered affirmatively.[1] Maples drove to Collier Road and let Golivesky out. Golivesky noticed nothing out of the ordinary about Maples' driving. When Golivesky got out at his home around 2:30 a.m., he made sure that Smith, sitting in the front passenger seat, and Maples had fastened their seat belts.

That same morning, Lyons, an employee with Yellow Freight Systems in Marietta, left his home in McDonough no later than 3:00 a.m. in order to make his 4:30 a.m. shift and headed north on I-75 in light traffic. Just after passing the Howell Mill Road exit, Lyons noticed headlights coming toward him, approximately a quarter mile ahead. Although Lyons could not judge the car's speed, he could see that the car was weaving from lane to lane, up to three or four lanes at a time. Lyons took his foot off the gas pedal and began to flash his lights and blow his horn, to no avail. Lyons saw the oncoming car veer from its driver's left-hand side and start to the driver's right. Lyons then saw the car turn toward him and he cut his car hard and went toward the median across three lanes. The oncoming car passed

---

[1] Although neither Smith nor Golivesky observed Maples ingest any Ecstasy at the club, his blood did test positive for Ecstasy.

between the driver's side of Lyons' car and the median wall. As he glanced at the car, Lyons saw a dark colored car with one person in it. As Lyons pulled over and stopped at the median wall, he looked in his rearview mirror and saw the dark car swerve back into traffic and hit an oncoming car. Lyons saw no brake lights on the dark car before the crash, and he saw the rear ends of both cars go up in the air and the cars spin. In Lyons's opinion, there was nothing the oncoming driver could have done to avoid the accident.

Callear, from Illinois, was also traveling north on I-75 that morning after going to Florida to pick up his daughter. Driving through Atlanta in light traffic, Callear noticed brake lights from a car in front of him. Callear noticed nothing unusual about the car and it was not weaving. He then saw an explosion and stopped his vehicle. He found two cars in the middle of the expressway, with one on its right side. Callear saw a person's arm sticking out the window of the driver's side of that car, the Grand Am, and believed he was dead. Callear heard someone moaning in the car and stayed with him until emergency personnel arrived.

Eric Maples was dead at the scene from massive blunt force trauma and Jason Smith, his passenger, suffered a broken ankle, all of his ribs were broken, and his heart was bruised. His lung collapsed and five chest tubes were inserted, leaving scars on his torso and body.

Firefighter Miller, among the first rescuers on scene, helped extricate the sole occupant of the Honda Accord, later identified as Verlangieri. The Honda was closer to the retaining wall than the Grand Am. Verlangieri was conscious, but incoherent and combative. Miller could smell alcohol in the vehicle.

Police Officer Huer received the call of a wrong way vehicle on I-75 and was responding when, at 3:45 a.m., he received notification of the wreck. Huer found Verlangieri in the Honda and obtained his identification. Verlangieri was conscious, yelling and combative, and Huer noticed a strong odor of alcohol coming from Verlangieri's breath, his person, and the car itself. Verlangieri had an open beer bottle between his legs, which fell out when he was moved, and there was an open 12-pack of beer on the passenger side floorboard.

Grady Hospital (Grady) trauma surgeon Dr. Cava met Verlangieri at the emergency room. There, the bracelet from the stat pack with the stat pack number 11364 was put on Verlangieri and a card with that number attached to his stretcher.[2] Dr. Cava smelled alcohol around the face area of Verlangieri.

---

[2] The hospital did not yet have a name for the patient. Stat packs are used for identification until the patient is officially identified and admitted to the hospital, so treatment can begin immediately.

Police Officer Cox, a member of the hit-and-run and traffic fatality unit, was assigned to investigate the wreck and arrived on scene around 5:00 a.m. and oversaw the taking of the photographs by the crime scene technician, as well as taking statements from witnesses. He also found in the Honda Verlangieri's driver's license and a repair bill listing Verlangieri's home address in Jonesboro, south of Atlanta. The driver's license listed Verlangieri as 6 feet 2 inches and 226 pounds. Cox then went to Grady and located Verlangieri by asking officers and others and obtaining the stat pack number. Having decided to charge Verlangieri based on his investigation, Cox issued citations to him and, around 7:00 a.m., asked Dr. Cava to draw two tubes of blood from Verlangieri "because of the state requirements." The blood was drawn at 7:17 a.m. by Dr. Cava in the presence of Officer Cox and Grady Detention Officer Scruggs while Verlangieri was unconscious. Verlangieri's blood alcohol level three hours after the accident was 0.12 grams percent, equivalent to a 225-pound man ingesting 7.3 standard beers. Assuming a normal metabolic rate, Verlangieri's blood alcohol level at the time of the collision would have been 0.23 grams percent, or the equivalent of 14 standard beers. According to the forensic toxicologist, this level would make a man mentally confused, lose critical judgment skills, have impaired depth perception and grossly reduced reaction time, and be unable to drive a straight line.

Smith was treated by another doctor at Grady who treated his extensive chest injuries and broken bones. No alcohol was found in Smith's system.

Brown, the State's accident reconstruction expert, opined that, based upon his analysis of the photographs and computer simulations, Verlangieri's brown Honda Accord was the vehicle traveling southbound in the northbound lanes of I-75, weaving, and caused the wreck.

Verlangieri's expert witness opined only that there was insufficient evidence upon which to render an opinion regarding which vehicle had been going which direction prior to the accident, but acknowledged that Brown's opinion could be correct.

1. In his first enumeration, Verlangieri argues on several bases that the blood test results were improperly admitted.

(a) He first argues they were improperly admitted over his "objection that OCGA § 40-5-55 is unconstitutional."[3]

---

[3] Verlangieri's trial was held in November 2001. *Cooper v. State*, 277 Ga. 282 (587 SE2d 605) (2003) determined that the serious injury or fatality provision of OCGA § 40-5-55 (a) was unconstitutional because it allowed a search and seizure without probable cause. Cooper was not under arrest at the time he was read the implied consent warning.

As noted in the order of the Supreme Court transferring this case to this Court, this issue was not raised by Verlangieri until his motion for new trial, and the constitutionality issue was not properly before that Court because it is too late to raise that issue after a guilty verdict has been returned. *Kolokouris v. State*, 271 Ga. 597 (1) (523 SE2d 311) (1999). For the same reason, this Court may not consider the issue. *Hughes v. State*, 266 Ga. App. 652, 654 (2) (598 SE2d 43) (2004).[4]

(b) Verlangieri also contends that the blood test results were improperly admitted over his hearsay objection regarding the testimony of Andria Freemont, a senior forensic toxicologist with the Georgia Bureau of Investigation (GBI).

Although Verlangieri's brief relies upon and quotes from the testimony at the pretrial hearing conducted on his motion in limine seeking to exclude the blood test results, no transcript of that hearing is contained in the record before us and we will not consider statements made in briefs regarding this. *McFarlin v. State*, 259 Ga. App. 838, 840 (3) (578 SE2d 546) (2003).

The argument made here deals with hearsay as invoking the confrontation clause of the Sixth Amendment. The confrontation argument, however, was not made below since a hearsay objection does not raise that issue. *Walton v. State*, 278 Ga. 432, 434 (1) (603 SE2d 263) (2004); *Harris v. State*, 230 Ga. App. 403, 404 (2) (496 SE2d 277) (1998).

(c) Objection to admission of the blood tests on the ground that the State had failed to lay the foundation required by OCGA § 40-6-392 (a) (1) (A) was made below, both by the motion in limine and objection at trial.

Verlangieri argues that the State failed to show, as required by that Code section, that the chemical analysis of his blood was "performed according to methods approved by the Division of Forensic Sciences of the Georgia Bureau of Investigation."

The admission of evidence rests within the sound discretion of the trial court and will not be disturbed absent its abuse. *Scara v. State*, 259 Ga. App. 510 (577 SE2d 796) (2003); *Gaston v. State*, 227 Ga. App. 666, 668 (490 SE2d 198) (1997).

Andria Freemont was a senior forensic toxicologist at the GBI Crime Lab in 1999, with a permit to conduct blood and alcohol testing.

---

[4] We note that, since traffic citations had been issued by Officer Cox before the blood was taken and Verlangieri was unconscious and in the custody of the detention officers at Grady, as the trial court stated, there was probable cause for the search in this case, regardless of the serious injury/fatality provisions of OCGA § 40-5-55. *Strong v. State*, 231 Ga. 514 (202 SE2d 428) (1973). Compare *Handschuh v. State*, 270 Ga. App. 676, 677 (1) (607 SE2d 899) (2004) with *Oliver v. State*, 268 Ga. App. 290 (601 SE2d 774) (2004).

Monica Williams was a toxicologist whom Freemont supervised as a trainee. As part of the training process, once a scientist such as Williams was hired and completed initial training, she would work with another scientist during her training period.

The crime lab uses gas chromatograph machines to run numerous blood samples at the same time. Those machines produce charts of the actual test analysis of the samples. The analysis is done by headspace gas chromatography, which tests the gas produced by alcohol. The instrument can determine both the quantity of alcohol and differentiate between types of alcohol. Prior to testing Verlangieri's blood, calibration tests were run on the machine to be used, the machine was permitted and working properly, and the expected results of those calibration tests were noted by Williams in her research notebook. Two samples of Verlangieri's blood were then tested and came within the accepted margin. Williams' research notebook stated the vial number and case number of Verlangieri's blood, as well as the results of the other tests which she ran.

Freemont did not do the physical opening of Verlangieri's blood samples, pipette them into the vial for testing, place them in the machine and run the tests. Those acts were done by Williams.

The results of the tests run by Williams (i.e., the chromatograms), along with Williams' research notebook, were then reviewed and approved by Freemont. Based on that information, the May 21, 1999 official report of Verlangieri's tests was issued and Freemont's signature was machine imprinted on the report. According to Freemont, this was the procedure which the GBI used in 1999 for all scientists, such as Williams, who were in a probationary period. It was common practice for the pipetting and physical inserting of the samples into the machine to be done by the probationary scientists.

Chemical analysis of the person's blood, urine, breath, or other bodily substance, to be considered valid under OCGA § 40-6-392 (a) (1) (A), shall have been performed according to methods approved by the Division of Forensic Sciences of the GBI (DFS) on a machine which was operated with all its electronic and operating components prescribed by its manufacturer properly attached and in good working order and by an individual possessing a valid permit issued by the DFS for this purpose. *Peek v. State*, 272 Ga. 169 (527 SE2d 552) (2000); *Munda v. State*, 172 Ga. App. 857, 858 (324 SE2d 799) (1984). Pursuant to that Code section, the DFS has published rules in compliance with the Administrative Procedure Act (APA) that set forth qualification requirements for individuals performing chemical analysis of a person's blood, including a requirement that they either hold a

bachelor's degree in chemistry,[5] or its generally recognized equivalent, or be "a laboratory technician or aide employed as member of the staff of the Division of Forensic Sciences." Ga. Comp. R. & Regs. r. 92-3-.02 (1) (e) 4., 5. See *Berkow v. State*, 243 Ga. App. 698, 700 (534 SE2d 433) (2000). Further, the rules provide that "[a]ll blood and urine drug tests will be performed by the Georgia Bureau of Investigation, Division of Forensic Sciences [and] [a]ll blood and/or urine alcohol tests will be performed in accordance with a quantitative Gas Chromatographic technique." Ga. Comp. R. & Regs. r. 92-3-.06 (7), (9). These rules are automatically deemed part of the record pursuant to OCGA § 50-13-8, which requires courts to take judicial notice of any regulation promulgated in accordance with the APA without the necessity of an evidentiary proffer.

Our Supreme Court has held that the State may prove compliance with the "approved methods" requirements of OCGA § 40-6-392 (a) (1) (A) solely through the oral testimony of the individual who conducted the test. *Price v. State*[, 269 Ga. 222, 225 (498 SE2d 262) (1998)] (gas chromatography test admissible through oral testimony of analyst who administered it). In *Radcliffe v. State*, [234 Ga. App. 576, 578-579 (507 SE2d 759) (1998),] we held results of a blood test admissible where the DFS forensic toxicologist testified simply that the tests were performed according to methods approved by the DFS. Likewise, the existence of permits and certificates required by the statute and DFS rules may be proven orally through competent circumstantial evidence. *Gidey v. State*[, 228 Ga. App. 250, 252 (491 SE2d 406) (1997)]. In *Banks v. State*, [235 Ga. App. 701 (509 SE2d 63) (1998),] we held that testimony by the officer that he was certified to operate the Intoxilyzer 5000 when he tested the defendant and that the machine appeared to be working properly, while "perhaps 'marginal,'" was enough by itself to satisfy the State's burden of proof. Id. at 702 (1). In *Koulianos v. State*, [192 Ga. App. 90 (383 SE2d 642) (1989),] the officer's testimony that he was a licensed intoximeter operator and that he performed the test in accordance with what he had been taught by the DFS, combined with the intoximeter printout showing his name and permit number, was held to be sufficient evidence of his qualifications.

---

[5] Williams testified at the hearing on the motion for extraordinary new trial that she had a B.S. in chemistry from Emory University and an M.S. in analytical chemistry from Georgia State University.

(Footnotes omitted.) *Scara*, supra at 511-512 (1). See also *State v. Palmaka*, 266 Ga. App. 595 (597 SE2d 630) (2004); *State v. Naik*, 259 Ga. App. 603 (577 SE2d 812) (2003).

To the extent that Verlangieri's argument is that the official report and Freemont's testimony regarding the testing procedures should not have been admissible because Williams did not testify, we find no merit to it. Here, as in *Birdsall v. State*, 254 Ga. App. 555, 556 (562 SE2d 841) (2002), the supervisor, whose signature appeared on the official report, testified based upon the "numerical data printed out by the chromatograph." Id. Both the report and the testimony were allowed in *Birdsall*, supra. See also *Price*, supra at 224 (2); *Mitchell v. Dept. of Human Resources*, 222 Ga. App. 546 (474 SE2d 727) (1996); *Lewis v. State*, 215 Ga. App. 486, 488 (2) (451 SE2d 116) (1994).

(d) Verlangieri also argues the test results were improperly admitted because the State failed to establish by a preponderance of the evidence that the blood tested was actually his.

This argument is also based upon testimony at the November 5 and 6, 2001 pretrial hearing on his motion in limine, the transcript of which is not before us. No transcript was created pursuant to OCGA § 5-6-41 (g) and the allegations contained in Verlangieri's brief are no substitute. *Brown v. Thomas*, 191 Ga. App. 679, 680 (1) (382 SE2d 656) (1989). "Absent a transcript, this court can only presume that this portion of the trial was conducted in a regular and proper manner." (Citation and punctuation omitted.) *Reedman v. State*, 193 Ga. App. 688, 689 (2) (388 SE2d 763) (1989). The enumeration fails for this reason. *Keegan v. State*, 221 Ga. App. 487 (1) (472 SE2d 107) (1996); *Doster v. State*, 218 Ga. App. 174, 175 (460 SE2d 818) (1995).

We note that, to the extent that this factual argument was presented to the jury, it determined it adversely to Verlangieri.

2. Verlangieri contends that the trial court erred in denying his motion for new trial and extraordinary motion for new trial because the State committed a *Brady*[6] violation by not revealing that Williams had resigned from the GBI for twice switching blood samples during testing.

> Fundamental to any error based upon a violation of *Brady* is that appellant must prove that: (1) the state possessed evidence favorable to the defense, i.e., true *Brady* material; (2) the defense did not possess the evidence, nor could [he] obtain it [himself] with any reasonable diligence;

---

[6] *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

(3) the prosecution suppressed the favorable evidence; (4) [he] was denied access to such evidence during trial; (5) the disclosure would have benefitted the defense by providing evidence for the defense or impeaching prior inconsistent statements; and (6) the denial deprived [him] of a fair trial, i.e., a reasonable probability exists that the outcome of the proceedings would have been different had disclosure been made.

(Emphasis omitted.) *Bailey v. State*, 229 Ga. App. 869, 874 (3) (494 SE2d 672) (1997). See also *Pinson v. State*, 266 Ga. App. 254, 263 (8) (596 SE2d 734) (2004).

The State acknowledges that impeaching information, such as the fact that Williams had resigned before being fired after switching test samples on two other occasions,[7] was *Brady* material. Pretermitting elements (2) and (3), and assuming, without deciding, that Verlangieri could satisfy them, we consider whether he was denied access to this information during trial. Although Verlangieri became aware during the trial that Williams had done the actual testing, not Freemont, there was no notice to him that, in fact, Williams had resigned rather than being fired, satisfying the fourth element.

While, as argued by Verlangieri, the fact that Williams had switched samples might have lent support to his argument that the blood sampled was not his, this issue of whose sample was tested was argued fully to the jury, which resolved this factual issue against him. Further, as discussed above, the crime lab procedures were set up with blank testing, duplicative testing, and replicative testing to ensure integrity of the testing process. In fact, the switching of the samples by Williams was discovered by the normal lab testing procedures. As Williams testified during the hearing on the motion for extraordinary new trial, she properly tested the sample according to the GBI Crime Lab procedures and the initial result was 0.1272. Upon replicate testing of a second sample of this blood, the result was 0.1260. Thus, the results were valid.

Even giving Verlangieri the benefit of this element, however, the *Brady* claim must fail on the final element, that the failure deprived him of a fair trial, in that a reasonable possibility exists that the outcome of the trial would have been different had disclosure been made. *Brady*, supra; *Bailey*, supra.

During his treatment at Grady, Verlangieri's blood was taken by hospital personnel and tested for alcohol as part of the medical

---

[7] One was done several months prior to Verlangieri's wreck, the second several months afterward.

protocol. Although the results of this test were not used in the first trial, as acknowledged by Verlangieri's counsel during argument on the original motion for new trial, these results would be admissible during any retrial. See *King v. State*, 276 Ga. 126, 127 (1) (577 SE2d 764) (2003) (although State may not subpoena medical records from health care providers pursuant to *King v. State*, 272 Ga. 788 (535 SE2d 492) (2000), they may be seized pursuant to a properly issued search warrant); *Nikitin v. State*, 257 Ga. App. 852, 856 (1) (572 SE2d 377) (2002) (upon retrial, State could introduce the test results as actually run, even though mistaken testimony introduced at first trial).

Finally, even if admission of the blood tests were to be found to be error, there was other sufficient evidence in the record before us from which the jury could have concluded that, at a minimum, Verlangieri was guilty of vehicular homicide by DUI (less safe),[8] rendering any such error harmless. *King v. State*, 272 Ga. App. 8 (611 SE2d 692) (2005); *Jones v. State*, 273 Ga. App. 192 (614 SE2d 820) (2005). Callear and Lyons both witnessed the wreck. Upon arriving at the scene, medical personnel and officers smelled alcohol on Verlangieri's person and in the car, there was an open bottle of beer between his legs and an open 12-pack on the floorboard, and he was going the wrong way on I-75 North, heading toward his residence in Jonesboro. Upon arrival at the hospital, according to the treating doctor, Verlangieri smelled of alcohol around his face.

There was no error in the trial court's denial of the motion for new trial and extraordinary motion for new trial on the basis of *Brady*.

3. The enumerations labeled "b" and "c" by Verlangieri argue problems with Count 1 and Count 4 of the indictment, which are described in the brief as improperly charging homicide by vehicle by citing the improper Code section for DUI (Count 1) and failing to allege the predicate offense for reckless driving (Count 4).

No citations to the record are given for the location of the allegedly flawed indictment. In fact, the only indictment in the record before us does not suffer from these claimed defects. Verlangieri's brief acknowledges that the record here may not contain the flawed indictment.

Therefore, there is nothing for us to review with regard to these two enumerations. *McFarlin*, supra; *Keegan*, supra; *Reedman*, supra.

4. Consideration of the remaining enumeration is made moot by our decisions in Divisions 1 and 2.

*Judgment affirmed. Phipps and Mikell, JJ., concur.*

---

[8] He was so charged in Count 4.

Decided June 9, 2005 —

Garland, Samuel & Loeb, Donald F. Samuel, William C. Lea, Robert W. Chestney, Michael M. Hawkins, for appellant.

Paul L. Howard, Jr., District Attorney, Marc A. Mallon, Anne E. Green, Assistant District Attorneys, for appellee.