A07A1499. DELGADO v. THE STATE.
(651 SE2d 201)

MIKELL, Judge.

Walter E. Delgado, Jr., was convicted of enticing a child for indecent purposes and attempted child molestation based on acts committed against his ten-year-old niece. On appeal from the order denying his motion for a new trial, Delgado argues that the trial court improperly admitted hearsay evidence and committed "plain error" when it excluded his parents from the courtroom before the victim testified. Finding no reversible error, we affirm.

Viewed in the light most favorable to the verdict,[1] the evidence adduced at trial shows that the incident underlying the conviction occurred on November 1, 2004, at the apartment of the victim, her little sister, and their parents, Vivian Mariduene and Jose Santos.

---

[1] See *Carey v. State,* 281 Ga. App. 816, 817 (637 SE2d 757) (2006).

Delgado's wife Betty is Mariduene's sister, and the Delgados' daughters had been staying with Mariduene and Santos. All four girls shared a bedroom. On the date in question, the Delgados had come to visit their daughters. Mariduene testified that at 6:00 a.m., Betty knocked on her bedroom door, crying. Mariduene got up and found the victim, her daughter, "crying in the bathroom. . . . She was hysterical." According to Mariduene, the victim told her that her uncle had woken her up at 4:00 a.m., told her to come down from her loft bed, which she shared with her sister, and said that if she refused, he would take her sister. The victim told Mariduene that Delgado took her into the bathroom, tried to touch her, and tried to force her to touch him.

The victim, who was 12 years old at the time of trial, testified that early in the morning, Delgado entered her room and woke her up. He climbed into her loft bed, told her to come down, and "threatened either it was me or my sister." He told her to go to the bathroom. She testified that she did not want to go, but she was afraid that if she did not, her sister would get hurt. Once they were in the bathroom, Delgado tried to pull her pants down, but she pushed his hands away and pulled her pants back up. He also asked her to touch his penis. At some point, Betty came to the bathroom door, because the victim testified that she saw her aunt's reflection in the mirror. The victim testified that Betty gave no indication that she had seen the victim. However, Delgado told the child to go back to her room, where she laid down with one of her cousins. The victim testified that she told her parents what happened.

Santos testified that his daughter stated that Delgado tried to pull her pants down several times and that he asked her to touch his privates. When Santos confronted Delgado, "[a]t first he denied everything, [then] . . . he said that all he did was ask her to touch him." Mariduene testified that she was present when Delgado made this statement. Afterward, a physical altercation ensued, involving Delgado, Santos, and Mariduene's brother Roger, who also was living in the apartment.

A $200,000 bond was set for Delgado on December 10, 2004. The bond order prohibited him from leaving the state. The order was modified a few weeks later to permit him to reside anywhere in Georgia but requiring him to keep his probation supervisor aware of his exact address at all times. Delgado's probation supervisor testified that during January 2005, he learned that Delgado had left the state. A bench warrant was issued for his arrest. Delgado was located in New York City on August 9, 2005, and was transported to Newton County eight days later.

Delgado testified that he was in the living room watching television at approximately 3:30 a.m. when he saw the victim enter the bathroom and then return to her room. According to Delgado, he went

to use the facility, but there was no toilet paper, so instead of waking up his wife, he decided to ask the victim where he could find some. He opened the bedroom door and asked her, and she told him to look in the kitchen closet. Delgado testified that he could not find the toilet tissue, so he grabbed some hand towels and used the bathroom. Afterward, he turned off the lights and his wife opened the door. He told her not to come in because it smelled. They went back to sleep in the living room. According to Delgado, his wife woke him up at 5:30 a.m., hysterical. She repeated what the victim told her, took Delgado into the bathroom, and the victim again stated that Delgado had asked her to touch him. Betty became more hysterical and slapped him three times. Betty then "ran crying to her sister, knocked on the door, got her sister out first, . . . they confronted me in front of [the victim], Vivian asked [her] what had happened. [The victim] repeated the same thing. . . . I just kept repeating this never happened."

During the state's case-in-chief, Lieutenant Gwen Hightower, a Newton County Sheriff's Department investigator, testified that she interviewed the child on the date of the incident. An audiotape of the interview was introduced into evidence and played for the jury. On the tape, which has been included in the record on appeal, along with a transcript, the child states that Delgado forced her into the bathroom by threatening to "do it" to her little sister; that he pulled down her pants and tried to touch her vagina; that she pushed him away; and that he pulled down his pants and told her to grab his penis. The child also states that after Betty came to the door, Delgado told her to go to her room.

On the tape, the victim relates statements of her cousin, Delgado's daughter. The child states that she went to her cousin and said, "you have to help me[,] he has me . . . in the bathroom by myself and I don't want to go back in there." She was scared and crying, and she relates that her cousin held her and told her not to worry, that Delgado would not take her back to the bathroom, and that if he came back in the room, she would ask him to leave, because he was not supposed to be in there. According to the child, her cousin stated, "I'll take care of it if my dad comes back in here I'll ask him what he's doing and then he has no other choice but to say what he wanted."

The child also relates statements of Betty Delgado. The child states that when she woke up in the morning, Betty asked whether she was up at 4:00 a.m. The child replied "yes" and related the following: "And she was like what were you guys doing? I said he was telling me to do something I didn't want to do. And so she started crying and was like I knew something was going on. . . . She was just like screaming, crying and so she grabbed him and pulled him outside and was like why are you doing that?" Later, the child states that the first adult she told was Betty, who started crying and said,

I knew something was going on cause I saw him in the bathroom by himself and I don't know what he was doing. . . . She was like, you were in the bathroom with him weren't you? And we were like yeah. And she was scared, she said she would tell somebody. I'm gonna tell your mom.

1. In his first enumeration of error, Delgado contends that the trial court erred in admitting the audiotape in its entirety, without redacting the statements that the victim attributed to Delgado's wife and daughter. The declarants were under subpoena but failed to appear for trial. Delgado contended at trial, as he does on appeal, that the statements were testimonial within the meaning of *Crawford v. Washington*[2] and that their admission violated the Confrontation Clause of the United States Constitution. The state argued that the hearsay statements were admissible as part of the res gestae, as excited utterances, and to explain why the child did not wake up her parents. The trial court denied Delgado's motion to redact the statements at issue but acceded to his request to give a limiting instruction prior to the tape being played for the jury. The court cautioned the jury that "[a]ny statements attributed to [Delgado's wife and daughter] in this taped statement of [the victim] are not to be considered by you as to the truth for what they say. They are only to be considered to provide context for the responses of [the victim]."

Delgado does not challenge the state's argument that the statements were properly admitted under the res gestae exception to the hearsay rule.[3] Rather, he contends that even if the statements were admissible under a hearsay exception, they were barred by *Crawford*.[4] We agree with Delgado that the trial court erred in refusing to redact the statements of the absent declarants but conclude that the error was harmless.

In *Crawford*, the United States Supreme Court held that the admission of testimonial out-of-court statements violates the Confrontation Clause unless the declarants are unavailable and the defendant had a prior opportunity to cross-examine them.[5] *Crawford* did not delineate the parameters of testimonial evidence, but offered guidance, as explained by our appellate courts:

---

[2] 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004).

[3] OCGA § 24-3-3 provides: "Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of the res gestae."

[4] See *Walton v. State*, 278 Ga. 432, 434 (1) (603 SE2d 263) (2004) ("There is a distinct difference between a challenge to the admission of evidence based upon the Confrontation Clause and that based upon an exception to the hearsay rule") (citation and emphasis omitted).

[5] *Crawford*, supra at 68 (V) (C).

"[T]estimony" is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact, a formal statement made to government officers in the production of testimonial evidence, and made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.[6]

Since *Crawford*, our appellate courts have interpreted "testimonial" statements to include those statements made to law enforcement officers investigating a crime.[7] We recognize that the statements of the absent declarants in the case at bar were made to the victim, not to the investigator who interviewed the victim.[8] But they were relayed by the victim on an audiotape made in the context of a formal investigation. The audiotape was created under "circumstances which would lead an objective witness reasonably to believe" that any and all statements contained therein would be available for use at a later trial. Even if it could be said that the declarants were unavailable for trial, Delgado did not have a prior opportunity to cross-examine them. Accordingly, Delgado's constitutional right to confront witnesses was violated by the admission of the statements of his wife and daughter through the audiotaped interview of the victim.[9]

However, the admission of the statements was harmless because there is no reasonable possibility that the evidence contributed to Delgado's conviction.[10]

The erroneous denial of the opportunity to cross-examine and cast doubt on the testimony of an adverse witness is not necessarily prejudicial in every case. . . . Whether such an error is harmless in a particular case depends upon a host of factors. . . . These factors include the importance of the witness' testimony in the prosecution's case, whether the

---

[6] (Footnote omitted.) *Pitts v. State*, 272 Ga. App. 182, 186 (2) (612 SE2d 1) (2005), aff'd, 280 Ga. 288 (627 SE2d 17) (2006) (911 call did not fall within the scope of *Crawford* where the caller's primary purpose was to "thwart an ongoing crime or seek rescue from immediate peril").

[7] See *Fields v. State*, 283 Ga. App. 208, 212 (2) (641 SE2d 218) (2007).

[8] Compare *Brawner v. State*, 278 Ga. 316, 318 (2) (602 SE2d 612) (2004) (missing declarant's statement to detective held "testimonial" hearsay).

[9] Compare *Fields*, supra (where a witness testified at trial concerning a victim's out-of-court statements, which the victim made while the witness was calling 911 and relaying information regarding the crime, we held that the statements were properly admitted under the res gestae exception).

[10] See *Ross v. State*, 278 Ga. 429, 431 (2) (603 SE2d 268) (2004); *Moody v. State*, 277 Ga. 676, 680 (4) (594 SE2d 350) (2004).

testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.[11]

Here, the prosecution's case was very strong. The child made an outcry to her parents as soon as they were awakened by Betty Delgado. The victim's testimony at trial mirrored that of her statement to the investigator shortly after the incident. There were no inconsistencies in the testimony of any of the state's witnesses. And Delgado admitted that he fled the jurisdiction of the court after he was released on bond. "Flight is always a circumstance which may be shown and a jury is authorized to take into account in determining guilt or innocence of an accused."[12]

The error was also harmless because the victim's taped account of the argument between Delgado and his wife was merely cumulative to, and corroborative of, Delgado's own testimony.[13] Delgado testified that his wife was hysterical to the point that she slapped him three times after the victim repeated her allegations. The jury could have inferred from this testimony that Betty Delgado was suspicious that "something was going on" in the bathroom, as stated on the tape. And the statements of Delgado's daughter — that she comforted the victim, told her not to worry, would ask Delgado to leave if he came in their bedroom, and that he would have to say what he wanted if he entered the room — were relatively unimportant to the state's case. Therefore, we conclude that the violation of Delgado's Sixth Amendment right to confront his wife and daughter was harmless.

2. In his second enumeration of error, Delgado argues that the trial court violated OCGA § 17-8-54, as well as his state and federal constitutional right to a public trial,[14] when it partially closed the courtroom before the victim took the witness stand. We disagree.

OCGA § 17-8-54 provides:

---

[11] *Taylor v. State*, 285 Ga. App. 697, 704 (4) (647 SE2d 381) (2007), citing *Delaware v. Van Arsdall*, 475 U. S. 673, 684 (106 SC 1431, 89 LE2d 674) (1986).

[12] (Citations omitted.) *Hogans v. State*, 251 Ga. 242 (1) (304 SE2d 699) (1983).

[13] See *Gay v. State*, 279 Ga. 180, 182 (2) (611 SE2d 31) (2005) (*Crawford* violation is harmless where the improperly admitted testimony "was cumulative of other admissible evidence") (citation omitted); accord *Buttram v. State*, 280 Ga. 595, 597 (4) (631 SE2d 642) (2006).

[14] The Sixth Amendment to the United States Constitution guarantees that "the accused shall enjoy the right to a speedy and public trial." See also Ga. Const. Art. I, Sec. I, Par. XI (a): "In criminal cases, the defendant shall have a public and speedy trial by an impartial jury." See *Waller v. Georgia*, 467 U. S. 39, 47 (II) (A) (104 SC 2210, 81 LE2d 31) (1984) (complete closure of evidentiary suppression hearing over objection of the accused violated defendant's right to a public trial).

> In the trial of any criminal case, when any person under the age of 16 is testifying concerning any sex offense, the court shall clear the courtroom of all persons except parties to the cause and their immediate families or guardians, attorneys and their secretaries, officers of the court, jurors, newspaper reporters or broadcasters, and court reporters.

The statute was "based upon a legislative determination that there is a compelling state interest in protecting children while they are testifying concerning a sex offense."[15] In *Hunt v. State*,[16] this Court held that the partial closure permitted under Georgia's statute does not violate a defendant's Sixth Amendment right to a public trial.[17]

In the case at bar, Delgado complains that the court exceeded the scope of the statute by excluding his parents from the courtroom during the child's testimony. However, at trial, Delgado failed to object to the partial closure of the courtroom, or to the exclusion of his parents. In fact, his counsel queried: "It's my understanding your ruling applies to the parents of Mr. Delgado, as well, is that [correct]?" The court replied, "Oh, yes," and defense counsel made no further comment before the child testified. In *Hunt*, we held that the defendant's failure to object at trial to the closure of the courtroom waived his right to assert it as error on appeal.[18] *Hunt* is apposite and controlling. Accordingly, the complaint has been waived.

Delgado urges that we consider his enumeration of error under the "plain error" doctrine.

> Under the "plain error" doctrine, we will consider issues not properly raised and ruled upon in the trial court when the alleged error is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice or which seriously affects the fairness, integrity or public reputation of a judicial proceeding.[19]

According to our Supreme Court, the doctrine applies only to capital cases and to criminal cases in which the trial judge allegedly intimates an opinion of the defendant's guilt, in violation of OCGA § 17-8-57.[20] As this case does not fall into either category, the plain

---

[15] (Footnote omitted.) *Hunt v. State*, 268 Ga. App. 568, 571 (1) (602 SE2d 312) (2004).

[16] Supra.

[17] Id. at 569-571 (1).

[18] Id. at 571 (1).

[19] (Footnote omitted.) *Rambo v. State*, 266 Ga. App. 791, 794 (3) (598 SE2d 85) (2004).

[20] See *Pittman v. State*, 273 Ga. 849, 850 (4), n. 2 (546 SE2d 277) (2001). Accord *Cochran v. State*, 277 Ga. App. 251, 255 (2) (626 SE2d 217) (2006).

error doctrine does not apply. Nonetheless, Delgado contends that we should extend the doctrine to this case because it involves "structural error," that is, a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."[21] As we recognized in *Hunt*, "[a] violation of one's right to a public trial is structural error."[22] Although we did not address the plain error doctrine in *Hunt*, we did point out that where, as here, "the courtroom is only partially closed to spectators[,] . . . the impact of the closure is not as great, and not as deserving of such a rigorous level of constitutional scrutiny."[23] Here, at the very least, the press remained in the courtroom during the child's testimony. As such, Delgado was required to object to the exclusion of his parents from the courtroom in order for his claim to be reviewable on appeal. We decline to extend the plain error doctrine to his complaint of a partial violation of OCGA § 17-8-54.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED AUGUST 16, 2007.

*Adam M. Hames*, for appellant.

*W. Kendall Wynne, Jr., District Attorney, Melanie B. McCrorey, Assistant District Attorney*, for appellee.

---

[21] (Citation and punctuation omitted.) *Hunt*, supra at 570-571 (1).

[22] (Punctuation omitted.) Id. at 570 (1), quoting *Judd v. Haley*, 250 F3d 1308, 1314-1315 (II) (11th Cir. 2001). Other structural errors include total deprivation of the right to trial counsel, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, and the right to self-representation at trial. See *Arizona v. Fulminante*, 499 U. S. 279, 309-310 (II) (111 SC 1246, 113 LE2d 302) (1991). Accord *State v. Wooten*, 273 Ga. 529, 532 (2), n. 14 (543 SE2d 721) (2001).

[23] *Hunt*, supra at 571 (1), citing *Judd*, supra at 1315.